682 P.2d 1247

Wallace UMPHREY and Betty Umphrey, husband and wife; Diane M. Horn; John C. Stoke and Dorothy E. Stoke, husband and wife; Don E. Rower and Irene Rower, husband and wife; Gene F. Morgan and Donna J. Morgan, husband and wife; Wayne H. Frovarp and Thelma Frovarp, husband and wife; Fred L. Evans, Jr., and Vivian M. Evans, husband and wife, Plaintiffs-Respondents,

v.

Gary R. SPRINKEL and Kathleen A. Sprinkel, husband and wife; Northwest Real Estate, Inc., Defendants-Appellants.

Nos. 13600, 13601.

Supreme Court of Idaho.

Oct. 12, 1983.

On Rehearing Dec. 27, 1983.

R. Romer Brown, Coeur d'Alene, for defendants-appellants Sprinkels.

Sidney E. Smith of Smith, McCabe & Hosack, Coeur d'Alene, and Martin G. Weber of Lukins, Annis, Shine, McKay, Van Martin & Rein, Spokane, Wash., for defendant-appellant Northwest Real Estate.

Michael J. Verbillis and Norman L. Gissel, Coeur d'Alene, for plaintiffs-respondents Umphrey, et al.

Larry A. Wilde, Coeur d'Alene, for plaintiffs-respondents Hannas.

SHEPARD, Justice.

This is an appeal from a judgment against defendants-appellants for fraudulent misrepresentations made in the sale of real property. We affirm in part, reverse in part, and remand.

In 1962, defendant-appellant Gary Sprinkel purchased a one-half interest in a parcel of land of about 670 acres, known as Lone Mountain Ranch. His father and mother were the purchasers of the other one-half interest. On that property was a well. Originally it had been drilled as an oil well to a depth of 1700 feet, but it never produced any oil, and it was converted to a water well at about 400 feet shortly before the Sprinkels bought the property. At the time of the Sprinkels' purchase Edward Brown owned an adjoining piece of land and was using water from the well pursuant to a water right sold to him in 1961 by

the then owners of Lone Mountain Ranch. The sole residence on Lone Mountain Ranch also used water for this well. The well at that time supplied no other users or uses. In 1970, the residence, the surrounding ten acres, and "all water rights ... used thereon or appurtenant thereto" were deeded to the Antrims, who also obtained an easement for access to the well house, as the well itself was on property retained by the Sprinkels. Approximately two years later that land and accompanying water rights were sold to the Hannas, one of the plaintiffs in this action. The extent of the water right retained by the Sprinkels in the well, if any, after that conveyance is unclear and not directly at issue in this lawsuit.

In 1970, defendant Gary Sprinkel bought some shares in defendant Northwest Real Estate Company. Later he obtained his associate broker's license and one-half ownership in Northwest Real Estate, Inc., as well as posts as an officer and director of the company. In the early 1970's, he began to market the Lone Mountain Ranch property. Lone Mountain Ranch was subdivided into 40-acre "investment tracts" and ten-acre "user tracts" and listed for sale with Northwest. Sprinkel's prospectus stated that the user tracts would have "a good year-round road" and "domestic water supplied by REPA ... available prior to June 1st, 1973."

REPA is an acronym for Ramsey Environmental Protection Association. It was made up of local land owners desirous of securing a water supply for the area. REPA was formed in the latter part of 1971 and was incorporated in March, 1972, with Gary Sprinkel as its moving force and first president. The original idea was to supply water to a large area of some 5000 to 6000 acres. In September, 1972, Sprinkel received a letter from the Farmers Home Administration informing him that REPA would not receive any federal grants or loans. No effort was made to apply to any other federal agency and, as of that date,

REPA gave up on the idea of a master water system. Sprinkel next formulated a plan, apparently without consultation with the two existing users of the well, to put in a water system for the Lone Mountain tracts using the well on his property, which water system he would then give to REPA to operate. Expansion of the well's capacity beyond the existing two users required that the well casing be perforated. REPA members discussed the possibility, but rejected it in a March, 1974 meeting because of potential liability to the existing users of the well if perforation destroyed the well's capacity. Meanwhile Sprinkel began installing a water system using the well. At trial he contended that the two existing users had one-third interests in the well's equipment only, while he retained all rights to the water in the well.

Sprinkel had attempted to grant each of the purchasers of the user tracts a 1/20th interest in the well water, in the event that REPA did not accept the well. A water system eventually was constructed, with a pump separate from and inferior to that used by the existing two water users. REPA did not take over the well and eventually disbanded. At trial Sprinkel's evidence purportedly showed that the plaintiffs were using more water than were households in surrounding communities. Plaintiffs' evidence, however, indicated that there was insufficient water to bathe daily, to flush their toilets, to wash dishes and clothes, or to provide water for their trees and gardens. Their evidence also showed that when only two households used the well, water had to be rationed if used to water lawns and gardens.

The plaintiffs all purchased "user tracts" within the first eight months of 1973. These purchases apparently were land sale contracts requiring continuing payments to Sprinkel. Plaintiffs-Hannas bought three tracts, totalling 30 acres, as an investment, in addition to their prior purchase of the house and surrounding ten acres purchased from the Antrims. Plaintiffs-Rowers

bought 20 acres. Plaintiffs-Morgans bought five acres. The other five families who are plaintiffs bought ten acres each. In some of these sales, Sprinkel acted directly as the real estate agent; in others, various employees of Northwest acted as agents. Plaintiff-Horn purchased her tract with her mother, an employee of another real estate company, acting as the realtor.

Sprinkel contracted for road construction and in May or June of 1973, the contractor stripped twelve inches of topsoil from the designated roadway area and replaced it with six inches of pit run (rock varying in size from less than ¾ of an inch up to 12 inches in diameter). The contractor testified that county specifications required six inches more of crushed rock, but Sprinkel did not authorize that further work.

All plaintiffs contend that Sprinkel, or agents of Northwest acting under his direction, made fraudulent representations about the adequacy of the road and water supply. The Hannas filed suit on August 6, 1975, and the remainder of the plaintiffs filed suit a few days later. On the 16th of August, the Sprinkels filed suit against the Hannas, seeking forfeiture of the land contract for failure to make payments, a notice of forfeiture having been sent on July 1, 1975. In October, 1975, the cases were consolidated.

Upon motion of defendant-Northwest Real Estate, the court ordered that the fraud cases be segregated from the foreclosure suit, with the former to be tried first. An extensive pretrial order was entered April 18, 1979, framing the admitted and disputed facts, as well as the exhibits admitted and those to which there were objections. On May 2nd, the court granted Hanna's motion to exclude from the fraud case evidence of the notice of forfeiture sent by Sprinkel, on the grounds that the trials were segregated and that injecting the issue of nonperformance into the trial would unduly confuse the jury in deciding the issue of fraud.

The trial began with jury selection on November 6, 1979. In the First Judicial District, jurors are read a limited number of stock instructions before the start of the proceedings. Instruction No. 7 stated that the party asserting the truth of a fact must show that the proposition is more probably true than not, a preponderance of the evidence instruction. Defendants objected to that instruction on the grounds that in a fraud case the burden of proof is clear and convincing evidence. The court overruled the objection on the grounds that this was a preliminary instruction to orient the jury and that he would instruct them at the close of the trial that the elements of fraud require clear and convincing evidence. This was done in Instruction No. 10. Instruction No. 7 was not repeated at the close of the trial.

The defendants moved several times for dismissal of the suit, claiming it was barred by the two year statute of limitations for professional malpractice rather than the three year limit for fraud. This motion was denied. As to Sprinkel, the court believed that, because he was selling his own property, the professional malpractice statute did not apply to him. Northwest was found to be too tied to Sprinkel and involved in a continuing course of conduct, and the court denied the motion as to Northwest as well.

Both defendants objected to Instruction No. 24, which told the jury they could award "special or consequential" damages if they found fraud, defendants asserting that the instruction conflicted with the out-of-pocket rule of damages. The court overruled this objection on the grounds that the plaintiffs were entitled to damages to compensate them for the repair of the road and to keep the water system working. Northwest and Sprinkel also objected to Instruction No. 24A, which told the jury the proper element of compensatory damages was the difference between contract price and actual value and that they could use the reasonable cost of repair in determining the difference. Appellants asserted that no repairs can be made to "raw land," and

that this instruction was duplicative of Instruction No. 24. This objection was overruled without comment.

In his closing argument, the attorney for plaintiffs other than the Hannas proposed to the jury that they take away the profit from Sprinkel as a means of imposing punitive damages. He suggested that they consider the profit Sprinkel obtained on the entire Lone Mountain Ranch subdivision, including the 40-acre investment parcels not at issue in this case. The attorney for Northwest objected on the grounds that the 40-acre parcels were not to be supplied with water and were not part of this suit. The court overruled the objection, stating "it's up to the jury to remember the evidence." In his closing argument, Northwest's attorney did not address the issue of punitive damages. Sprinkel's attorney did respond to the punitive damage claim, but made no argument concerning the 40-acre investment parcels.

On December 8, 1979, the jury came back with a unanimous verdict for each of the plaintiffs. At the request of Northwest's counsel, the jury was polled. The court then asked all jurors to remain in the jury room while the attorneys examined the verdict forms. No objections were made. On December 12th, the plaintiffs moved to "amend and clarify" the verdict based upon jurors' affidavits. Attached to those affidavits were computations used by the jurors in arriving at their verdict. All these were identical, with the exception of one juror whose computations varied slightly. The affidavits also stated that plaintiff Hanna was awarded an additional sum for loss of anticipated profits.

On December 20, 1979, the court entered an order amending the jury verdict and giving judgment in favor of all the plaintiffs jointly and severally against defendants. The court believed from the face of the verdict that the jury was confused as to what constituted compensatory as opposed to punitive damages and that the jury had spent a considerable amount of time in calculating the damages. The calculations submitted to the court were those actually made during deliberation and were not a reconstruction. Commenting on the difficulty attorneys have in distinguishing compensatory and punitive damages, the court said that he believed it entirely proper in this case to consider the calculations to "clarify the verdict and not for the purpose of impeaching the verdict." The court then left in the compensatory category only the difference between contract price and actual value, and consequential damages. All other classification of damages, including out-of-pocket attorney's fees, "person and mental" damages (which the court characterized as "mental anguish"), and the ⅓ contingency attorney's fees, were shifted under the punitive damage heading, as the evidence was "clear" to support those elements. The amount designated as "punitive" damages, ($6,812.50 each) the court determined was clearly an attempt to take some of Sprinkel's profit from the Lone Mountain subdivision. The total amount of damages awarded was not changed. On March 7, 1980, the court entered another order reducing Hanna's recovery by $14,800, which amount the jury had awarded as loss of anticipated profits. This reduction is no longer at issue on appeal.

Defendants moved for a judgment N.O.V. and a new trial on the grounds that the action was barred by the statute of limitations. This motion was again denied.

In the action for forfeiture, which was held in abeyance pending the fraud cases, the court entered summary judgment for Sprinkel against Hanna on March 18, 1980, thereby declaring the contract to be forfeited.

Defendants Sprinkel and Northwest appeal, asserting numerous assignments of error.

I.

Appellants first argue that as real estate agents and brokers they are covered by the professional malpractice statute of limita-

tions, I.C. § 5–219(4), and that this statute with its two-year limitation applies rather than the statute of limitations for fraud, I.C. § 5–218(4), with its three-year limit and accrual upon discovery of the fraud. We disagree.

■■■ Assuming, without deciding, that real estate agents and brokers are professionals for the purpose of I.C. § 5–219(4), nevertheless we hold that an action for fraudulent misrepresentation does not fall within the protective embrace of the professional malpractice statute. As this Court has stated before, "[t]he gist of a malpractice action is negligence ..." *Trimming v. Howard,* 52 Idaho 412, 416, 16 P.2d 661, 662 (1932). An action for fraud or deceit involves more than mere negligence. While it is a tort action, it is more in the nature of an intentional tort, requiring that the speaker have knowledge of the representation's falsity or ignorance of its truth, as well as intent that the representation be relied upon. *See Faw v. Greenwood,* 101 Idaho 387, 613 P.2d 1338 (1980); *Smith v. King,* 100 Idaho 331, 597 P.2d 217 (1979); *Mitchell v. Siqueiros,* 99 Idaho 396, 582 P.2d 1074 (1978); *see generally* W. Prosser, *Handbook of the Law of Torts,* at 683–736 (4th Ed.1971). In addition, the plaintiff must prove all elements by clear and convincing evidence as opposed to the less stringent preponderance of the evidence standard used in ordinary negligence cases. *Faw v. Greenwood, supra; Smith v. King, supra.* Hence, we believe that an action for fraud and deceit is not within the purview of a malpractice action.

■■■ Neither do we believe that the legislature intended to produce a different result by its choice of language in I.C. § 5–219(4). The pertinent portion of that statute provides, "[t]he term 'professional malpractice' as used herein refers to wrongful acts or omissions in the performance of professional services ..." While fraudulent misrepresentations are concededly wrongful, to be covered by the statute the acts or omissions must be in the course of performance of a professional service. We decline to hold that fraud is part of the ordinary course of performance of professional services. Hence we believe that fraud does not fall within the scope of the statute. This is particularly true since the statute itself mentions fraud in a different context, by providing that fraudulent concealment of "the wrongful act" shall toll the statute of limitations. To hold that "wrongful act" includes fraud, as appellants request, would produce an anomalous result that the legislature could not have intended, *i.e.,* that the underlying fraud would not toll the statute of limitations, but that fraudulent concealment of the fraud would do so. The principal rule governing statutory interpretation is to give effect to the legislature's intent. *Gavica v. Hanson,* 101 Idaho 58, 608 P.2d 861 (1980); *Summers v. Dooley,* 94 Idaho 87, 481 P.2d 318 (1971). In construing a statute this Court may examine the language used, the reasonableness of the proposed interpretations, and the policy behind the statutes. *Gavica v. Hanson, supra; Summers v. Dooley, supra.* Language of a particular section need not be viewed in a vacuum. And all sections of applicable statutes must be construed together so as to determine the legislature's intent. *Magnuson v. Idaho State Tax Comm'n,* 97 Idaho 917, 556 P.2d 1197 (1976).

■ We hold, therefore, that an action for fraud or deceit is covered by the statute of limitations for fraud, I.C. § 5–218(4), rather than the statute of limitations for professional malpractice, I.C. § 5–219(4). The legislature has made a policy decision, of which we approve, to provide for accrual of the cause of action for fraud upon discovery of the facts constituting the fraud. This is founded upon the realization that fraud, an intentional and often orchestrated scheme, is ordinarily more difficult to discover than a negligent injury. Our holding today is consistent with the legislature's clear intent to afford victims of fraud more time in which to discover the

machinations which led to their exploitation.

These actions all were brought within three years after plaintiffs purchased their lots. Under any conceivable date of discovery of the defendants fraud, the statute of limitations has not run on their claims. I.C. § 5–218(4).

## II.

The second major issue raised by the appellants concerns the propriety of the trial court's action in shifting certain elements of damages from the compensatory damage category to the punitive damage category. Initially appellants argue that it was error for the trial court to use the jurors' affidavits in considering the amount of damages awarded. However, appellants themselves relied upon the same affidavits to have the award to Hanna reduced by $14,800 (a matter no longer at issue on this appeal), as it was awarded for Hanna's expectancy in lost profits. Appellants cannot use the affidavits below for their own purpose and to their own advantage, then argue on appeal against the use of those affidavits. *Cf. Masters v. State,* 105 Idaho 197, 668 P.2d 73 (1983); *Heckman Ranches, Inc. v. State,* 99 Idaho 793, 589 P.2d 540 (1979).

Turning to the substance of appellants argument, we find that the trial court's action below apparently presents an issue of first impression, as we have been cited to no cases from this or any jurisdiction approving, disapproving, or even mentioning such an action by a trial judge. Affidavits submitted by all twelve jurors stated that they divided the damages to each plaintiff into several different categories: (1) the difference between the purchase price and the actual value of the land, (2) out-of-pocket attorney's fees, (3) consequential damages (representing amounts expended in repair to the road and water system), (4) personal and mental damages (which the court denominated as mental anguish), (5) punitive damages (representing an attempt to remove some of defendants' profit from the scheme), and (6) ⅓

contingency attorney's fees. The jury's verdict lumped all of these damages into the compensatory damage category except $6,812.50 to each of the plaintiffs under the category of punitive. After examining the affidavits, the court shifted the damages for out-of-pocket attorney's fees, personal and mental damages, and the ⅓ contingency fee amount into the punitive damage category. The total amount due each plaintiff was not changed by this action.

The parties agree that the rule in Idaho is that courts may consider affidavits in order to clarify what the verdict was, but not to impeach the verdict. *Glennon v. Fisher,* 51 Idaho 732, 10 P.2d 294 (1932); *Drainage Dist. No. 2 v. Extension Ditch Co.,* 32 Idaho 314, 182 P. 847 (1919). In this state, such affidavits may be considered after the jury has been discharged, as was done here. *Drainage Dist. No. 2 v. Extension Ditch Co., supra.* While these affidavits may not be filed long after the jury has been dismissed, *Evans v. Davidson,* 57 Idaho 548, 67 P.2d 83 (1937), such was not the case here, as these affidavits were filed only a few days after the jury returned its verdict.

Appellants argue that the trial court impeached the verdict, while respondents assert that the court's action merely clarified the verdict. We agree with the latter contention. Guiding our decision is the following language of this Court from *Glennon v. Fisher, supra,* 51 Idaho at 736, 10 P.2d at 295:

"Appellants earnestly submit that a juror may not be permitted to impeach his verdict. That is not what happened here. Before any attempt to impeach, there must be a verdict rendered. There must be a positive declaration which the juror seeks to qualify or revoke. Here, the jurors returned a form of verdict, honestly believing it expressed their decision, whereas it signally failed to do so. It was the court's duty, when so apprised, to cause such correction as would

enable the filed paper to reflect the true verdict. Speaking directly, this court in *Drainage District No. 2 v. Extension Ditch Co.*, 32 Ida. 314, 182 Pac. 847, said at page 325:

'This is not a question of impeaching a verdict, but correcting it to conform to what was actually found and intended to be returned by the jury. The rule is that the court may permit the jury to fortify its verdict or to show by the affidavits of the jurors the verdict which they found and intended to return, and this may be done after they have been discharged.' "

Here, the affidavits of all twelve jurors show that a unanimous jury clearly intended to compensate the plaintiffs for the enumerated damages they had suffered at the hands of the defendants. Those items that the court shifted away from compensatory damages into the realm of punitive damages could not properly be denominated as compensatory damages under the laws of this state or under the instructions given. The only method by which the court could effectuate the jury's intent to award damages for those injuries was to include them as punitive damages.

This trial began on November 6, 1979 and a verdict was not returned until December 8, 1979. The dispute consumed sixteen or seventeen days of trial time and resulted in a trial transcript of over 2750 pages. As the court did not receive the motion to amend the verdict until after the jury was discharged, the judge chose to salvage this substantial investment of time and effort by the jurors and litigants by altering the verdict to conform to the unanimous intent of the jurors. Because the jury had been discharged, the court did not have the choice, which we deem preferable, of sending the jury back to correct its own verdict, as was done in *Brown v. Johnson*, 24 Utah 2d 388, 472 P.2d 942 (1970). When the jurors returned their verdict, they mistakenly, but honestly, believed that it reflected their decision, but, as shown by their affidavits, it actually did not.

The court was within its power to make the ministerial correction of moving certain elements of damages from the improper to the proper category. It is worthy of note that the court changed none of those individual amounts as they were shifted from one category to another, nor was there change in the final judgment awarded each plaintiff. The court's action thus seems less intrusive upon the jury's verdict than that approved by this Court in two prior cases. In *Drainage Dist. No. 2 v. Extension Ditch Co., supra,* this Court approved amending the verdict to increase the damages awarded to conform to the intent of the jury. In *Glennon v. Fisher, supra,* this Court approved amending the verdict from $125 against each of four defendants, to $500 joint and severable liability. In those two cases the defendants' financial liability was greatly increased. Under the facts of the instant case the defendants' total liability did not change. Hence, we believe that under the unique circumstances of this case, the court did not err by amending and clarifying the verdict, except as set forth herein (*see* section VI, *infra*).

### III.

Appellants next assert that the court improperly excluded evidence of the notice of forfeiture that had been sent to plaintiff Hanna. We disagree. We first note that the trials for fraud were severed from the foreclosure action upon motion of defendant Northwest, to which defendant Sprinkel made no objection. Appellants claim that, although the actions were tried separately, the forfeiture should have been considered in calculating the damages for fraud. We disagree.

In the recent case of *Nelson v. Armstrong*, 99 Idaho 422, 582 P.2d 1100 (1978), this Court unanimously held that, in an action in which a fraud claim is joined with a deficiency action, the trial court "should calculate [plaintiff's] damages for the fraud without regard to the unpaid balance on the contract." *Id.*, 99 Idaho at 432, 582 P.2d at 1110. *Accord Lamb v. Bangart,* 525 P.2d 602 (Utah 1974). Hence, the notice of forfeiture was irrelevant to Hanna's action for fraud and to damages therefor

and was properly excluded. Any deficiencies in the amount due the seller are to be calculated and considered in a separate action, as here, or in a counterclaim, as in *Nelson v. Armstrong, supra.*

### IV.

■ Next appellant Sprinkel argues that the trial court erred by giving an instruction to the jury, over his objection at the beginning of the trial, which stated that the party with the burden of proof had to carry that burden by a preponderance of the evidence. The plaintiff in a fraud case bears the burden of proving all elements of fraud by clear and convincing evidence. *Faw v. Greenwood,* 101 Idaho 387, 613 P.2d 1338 (1980); *Smith v. King,* 100 Idaho 331, 597 P.2d 217 (1979). At the close of the evidence, the trial court correctly and specifically instructed the jury that each element of fraud must be proved by clear and convincing evidence. Sprinkel argues that these two instructions served to confuse the jury. We disagree.

■ While instructions which are contradictory on material matters would require reversal, *Yacht Club Sales & Service, Inc. v. First National Bank of North Idaho,* 101 Idaho 852, 623 P.2d 464 (1980), we find no such contradiction here. The court merely gave a preliminary instruction to the jury after it was first impaneled to familiarize the jurors with their role as triers of fact. This was followed a month later by a very specific instruction on how they were to weigh the evidence they had just heard. Thus, the court gave general ground rules and then instructed more specifically that the more stringent burden of proof applied to the nine essential elements of fraud. Other courts have concluded that such general instructions followed by more specific instructions on the burden of proof do not constitute reversible error, even when both are given at the close of the evidence. *Freeman v. Saxton,* 243 Ga. 571, 255 S.E.2d 28 (1979); *Finefrock v. Carney,* 263 P.2d 744 (Okl.1953).

### V.

■ Appellant Sprinkel also challenges the sufficiency of the evidence offered by respondent Diane Horn to carry her burden of proof. Sprinkel principally relies on the fact that Horn's mother acted as realtor for the transaction in which Horn purchased a parcel of Lone Mountain Ranch. The record shows that representations about the road and water supply were made directly to Horn by an agent of Northwest and that she spoke to defendant Sprinkel about the water. There also is evidence that Horn's mother, acting as her agent, received misrepresentations from the defendants and passed them on to respondent Horn. The jury could have found that those representations were made, that they were false, and that defendants intended for Horn to rely upon them. "The issue as to whether fraud has been proven by clear and convincing evidence is for the determination of the trier of fact. On appeal that determination will not be reversed where supported by competent, substantial, though conflicting evidence." *Faw v. Greenwood,* 101 Idaho 387, 389, 613 P.2d 1338, 1340 (1980), *quoting Smith v. King,* 100 Idaho 331, 334, 597 P.2d 217, 220 (1979). Substantial evidence supporting the verdict having been found, it will not be reversed.

### VI.

■ Appellants' final arguments all relate to the issue of damages. They argue first that consequential damages cannot be awarded as compensatory damages and that the sole measure of compensatory damages is the difference between the actual value of the land and the purchase price. These damages awarded as consequential relate to the costs borne by the plaintiffs in maintaining and repairing the road and the water system. In *Jensen v. Bledsoe,* 100 Idaho 84, 593 P.2d 988 (1979), this Court concluded that the trial court properly included the cost of having a well drilled and sewage disposal system installed as part of the plaintiff's out-of-pocket expenses for defendant's fraudulent mis-

representations. The consequential damages here are no different. They represent expenditures by the plaintiffs of money and labor in attempting to bring the road up to the standard it was represented to be. In effect, these expenditures increased the purchase price which plaintiffs paid and therefore were properly awarded as compensatory damages as an element of the difference between the purchase price and the actual value of their property. Indeed, Professor Prosser has reported that in the minority of states which follow the out-of-pocket damage remedy in fraud cases, as does Idaho, recovery for consequential damages is permitted. W. Prosser, *Handbook on the Law of Torts*, at 735 (4th ed. 1971).

Next appellants argue that the court should not have permitted Umphrey's counsel to argue to the jury, over objection, that Sprinkel's profit on the entire Lone Mountain Ranch should be taken away, rather than merely the profit on the ten parcels at issue in the lawsuit. Appellants contend that this argument caused the jury to unduly inflate the award of damages.

 In general the primary purpose behind an award for punitive damages is to deter similar conduct from happening again in the future. *Gavica v. Hanson*, 101 Idaho 58, 608 P.2d 861 (1980); *Jolley v. Puregro Co.*, 94 Idaho 702, 496 P.2d 939 (1972); *Cox v. Stolworthy*, 94 Idaho 683, 496 P.2d 682 (1972). A determination of exemplary damages requires an examination of the total circumstances of the case. *Boise Dodge, Inc. v. Clark*, 92 Idaho 902, 453 P.2d 551 (1969). A defendant's financial status may be considered in determining whether a damage award will have any deterrent effect. *Cox v. Stolworthy, supra*. More importantly, this case could be

viewed as involving relatively unsophisticated purchasers of real property who were deliberately led into a fraudulent scheme, conducted for profit. The jury was justified in taking into account the defendants' entire scheme to sell property at Lone Mountain Ranch, which was not their only subdivision in the area, rather than just the fraudulent portions of the scheme at issue in this suit. The chances of deterring future misconduct are accordingly materially increased. *Boise Dodge, Inc. v. Clark, supra; Cox v. Stolworthy, supra*.

 It is well established in this state that punitive damages may be awarded when the defendant has committed fraud. *Jolley v. Puregro Co., supra; Boise Dodge, Inc. v. Clark, supra*. Here a unanimous jury found fraudulent misrepresentations. Hence, punitive damages are appropriate. The various plaintiffs were awarded compensatory damages from $4,200 to over $14,000 and punitive damages from $21,000 to $30,000.[1] In *Jolley v. Puregro Co., supra*, and *Cox v. Stolworthy, supra*, it was stated that when exemplary or punitive damages are justified, the plaintiffs should at least receive the cost of attorneys fees, expert witness fees, litigation costs, and other expenditures made by the plaintiffs. Here it is clear from the affidavits that the jury did award plaintiffs their attorneys' fees. However, additional exemplary damages can be made in certain limited circumstances. *Jolley v. Puregro Co., supra; Cox v. Stolworthy, supra*. One of those situations in which additional awards are appropriate is when the defendant is engaged in deceptive business practices operated for profit posing danger to the general public. *Boise Dodge, Inc. v. Clark, supra; Cox v. Stolworthy, supra*.[2]

1. The ultimate awards to the plaintiffs can be summarized as follows:

| Plaintiff | Compensatory Damages | Punitive Damages | Total Damages |
|---|---|---|---|
| Umphrey | 6,200.00 | 21,815.50 | 28,015.50 |
| Horn | 5,650.00 | 21,632.50 | 27,282.50 |
| Stoke | 5,556.80 | 21,534.50 | 27,091.30 |
| Rower | 5,200.00 | 21,482.50 | 26,682.50 |
| Morgan | 4,262.50 | 21,170.80 | 25,433.30 |
| Frovarp | 5,609.00 | 21,618.50 | 27,227.50 |
| Evans | 6,200.00 | 21,815.50 | 28,015.50 |

for a total judgment of $189,748.10.

| Hanna | 14,822.00 | 45,489.15 | 60,311.15 |

The punitive damage award to Hanna, as noted before, was reduced by $14,800.

2. Although *Cox v. Stolworthy, supra*, was recent-

We believe defendant's practice of falsely representing that building lots would be supplied with adequate water and access falls squarely within the ambit of deceptive business practices in which the award of additional punitive damages is authorized.

■ The remaining question argued by appellants is whether those additional damages are excessive. The testimony showed that these plaintiffs, all of rather modest means, were induced to move to these lots in the country, only to find that they had inadequate water. They could not flush their toilets for days at a time. Their gardens and fruit trees, typical amenities of country living, withered and died from lack of water. Having made their investments, they could not afford to move elsewhere and had to remain under these unhappy living conditions. Given the nature of the injury inflicted on these purchasers and the possibility that the defendants or someone else in defendants' position, with substantial parcels of land to subdivide in this state, might feel tempted to misrepresent the water available for their parcels and inflict similar injury on other innocent purchasers, the additional exemplary damage awards were not excessive. *See Boise Dodge, Inc. v. Clark, supra,* in which this Court upheld a jury's award of total punitive damages of $12,500 and compensatory damages of $2,050 in a similar case, although the day-to-day living conditions of the injured parties were not nearly as dramatically affected. Here none of the punitive damage awards were six times the compensatory award, as in *Boise Dodge.* Hence, while these punitive damage awards are far from insubstantial, they cannot be characterized as excessive.

We agree, however, with the defendants-appellants' contention that certain of the damages awarded by the jury have been duplicated or are inappropriate. Specifically, the record indicates that the jury included in its out-of-pocket category of consequential damages an amount of between $1,500 and $1,550 per plaintiff, which amount each of the plaintiffs had advanced for attorney's fees to begin the lawsuit. According to the computations set out in the jurors' affidavits, those advances for attorney's fees were also incorporated into their final figure for each plaintiff, from which figure the jury then computed an additional one-third add-on for attorney's fees. Thus, the attorney's fees award was improperly duplicative and should be reduced.

■ In addition, the jury added $6,500 to the award for each plaintiff in the consequential damages category for "mental" damages, although the jurors had not been instructed on that issue by the court. The general rule is that recovery cannot be had for mental anguish in fraud cases. As stated in 37 C.J.S. Fraud § 141(f) (1943):

"[R]ecovery cannot be had in an action for deceit for injury to plaintiff's feelings and public disgrace incurred through being deceived through false representations, or for anxiety, worry, and harassment arising from fraud, or from annoyance or inconvenience."

A number of jurisdictions follow this or a similar rule. *See, e.g., Moore v. Slonim,* 426 F.Supp. 524 (D.C.Conn.), *aff'd,* 562 F.2d 38 (2nd Cir.1977) (damages for mental distress not ordinarily available in a cause of action for business fraud); *Kantor v. Comet Press Books Corp.,* 187 F.Supp. 321 (S.D.N.Y.1960) (damages for mental anguish not recoverable in action for fraud); *Sierra National Bank v. Brown,* 18 Cal. App.3d 98, 95 Cal.Rptr. 742 (1971) (mental distress not an element of damages for fraud); *Chandler v. Ziegler,* 88 Colo. 1, 291 P. 822 (1930) (instruction allowing additional damages for annoyance and inconvenience held to constitute reversible error); *Ellis v. Crockett,* 51 Hawaii 45, 451 P.2d

ly overruled in part (*Cheney v. Palos Verdes,* 1983, 104 Idaho 897, 665 P.2d 661), such action related only to the measure of allowable puni-

tive damages and not to the general law of punitive damages announced in *Cox v. Stolworthy, supra,* and reiterated herein.

814 (1969) (in cases of fraud, there may be no recovery for mental anguish or humiliation not intentionally inflicted); *Harsche v. Czyz*, 157 Neb. 699, 61 N.W.2d 265 (1953) (in an action for fraud, instruction permitting recovery for mental anguish and humiliation constituted prejudicial error).

In *Hatfield v. Max Rouse, & Sons Northwest*, 100 Idaho 840, 847, 606 P.2d 944, 951 (1980), this Court set aside an award of damages for mental suffering, quoting from the Restatement of Contracts § 341 (1932):

> "In actions for breach of contract, damages will not be given as compensation for mental suffering, except where the breach was wanton or reckless *and* caused bodily harm *and* where it was the wanton or reckless breach of a contract to render a performance of such a character that the defendant had reason to know when the contract was made that the breach would cause mental suffering for reasons other than mere pecuniary loss." (Emphasis added.)

In footnote 3 of *Hatfield v. Max Rouse & Sons Northwest, supra,* 100 Idaho at 846–847, 606 P.2d at 950–951, the Court stated that "the determination of whether damages for emotional distress are allowable as part of the measure of recovery for fraud would follow an analysis similar to the one we follow ... for breach of contract." Even if such mental suffering were permissible as damages in this kind of case, according to both *Hatfield v. Max Rouse & Sons Northwest* and the Restatement language approved in that case, it would have been the duty of the trial court to instruct the jury that such damages would be allowable only when "such damages were within the contemplation of the parties at the time they formed the contract." No such instruction was given to the jury here.

The judgment of the court below is affirmed in all respects except its award of damages, and in that regard is reversed. On remand, the trial court is instructed to submit to plaintiffs-respondents a remittitur reducing their respective awards by either $8,000 or $8,050, whichever applies, consisting of the $1,500 or $1,550 attributable to attorney fees which were improperly duplicated, plus the $6,500 erroneously allowed for mental damages. If such remittitur is not accepted by plaintiffs-respondents, the court is directed to set aside the verdicts and judgment and order a new trial. In the event the remittitur is accepted on the issue of damages, the judgment will stand affirmed.

Costs to respondents. No attorney fees to any party.

DONALDSON, C.J., concurs.

McFADDEN, J. (Ret.), concurs in the result.

BISTLINE, Justice, concurring in part and concurring in the judgment.

Other than where the Court's opinion cites with approval *Hatfield v. Max Rouse & Sons, Inc.,* 100 Idaho 840, 606 P.2d 944 (1980), an opinion which, in my view, was result-oriented and rampant with error (*Cheney v. Palos Verdes*, 104 Idaho 897, 665 P.2d 661 (1983) Bistline, J., specially concurring), I concur in today's opinion and concur in the judgment [1] as well, although in my view there is authority for affirming *en toto.* See, for instance, *Gallick v. Baltimore & Ohio Railroad Co.,* 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963); *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962); *United Airlines v. Wiener,* 335 F.2d 379 (9th Cir.1964). On the validity of damage for emotional distress, see the recent case of *Schultz v.*

---

**1.** It is my understanding that the judgment of the district court is affirmed, provided that each of the plaintiffs files with the district court an agreement to submit to remittiturs in amounts of $8,000 or $8,500, and that as to those plaintiffs who do not do so, their judgments will be set aside and a new trial ordered on the issue of damages only.

*Barberton Glass Co.*, 4 Ohio St.3d 131, 447 N.E.2d 109 (1983), and cases relied upon therein from the jurisdictions of New York, New Jersey, California, Pennsylvania, and Hawaii. "Having carefully examined the arguments in support of the contemporaneous physical injury rule, it is clear that continued adherence to the rule makes little sense." *Schultz*, 447 N.E.2d at 112.

BAKES, Justice, concurring in part:

I concur in that portion of the Court's opinion which affirms the liability of the defendants, but reverses the award of damages. However, both the action of the trial court and of this Court in reworking the jury's verdict in order to correct the obvious error which occurred in the damages portion of this trial points out the necessity for an unconditional new trial on the issue of damages. The problems which the trial court and this Court are struggling with in order to try to make sense out of this jury's verdict actually stem from inadequate and erroneous instructions to the jury on the issue of damages. No amount of restructuring by either the trial court or this Court can compensate for the error in the jury instructions on the issue of damages. To do so not only compounds the error, but deprives both parties of their constitutional right to a trial by jury on the damages issue.

I join the Court's reversal, but would remand the matter for an entire new trial on the issue of damages.

## ON REHEARING

HUNTLEY, Justice.

The Court's opinion of October 12, 1983, with one exception, the computation of the ultimate awards set forth in footnote 1, is reaffirmed.

On rehearing the attorneys for Northwest Real Estate Inc. have invited our attention to the fact that the reductions in total judgment as computed in footnote 1 failed to make reductions of the ⅓ attorney fees proportionate to the amount by which the individual awards were reduced.

Thus, footnote 1 of the opinion is amended to read as follows:

| Plaintiff | Compensatory Damages | Punitive Damages | One-third of Disallowed Sum Awarded as Atty Fees to be Reduced | Total Damages |
|---|---|---|---|---|
| Umphrey | $6,200.00 | $21,815.50 | $(2,683.34) | $25,332.16 |
| Horn | 5,650.00 | 21,632.50 | (2,638.34) | 24,599.16 |
| Stoke | 5,556.80 | 21,534.50 | (2,638.34) | 24,407.96 |
| Rower | 5,200.00 | 21,482.50 | (2,666.67) | 24,015.83 |
| Morgan | 4,262.50 | 21,170.80 | (2,638.34) | 22,749.96 |
| Frovarp | 5,609.00 | 21,618.50 | (2,638.34) | 24,544.16 |
| Evans | 6,200.00 | 21,815.50 | (2,638.34) | 25,332.16 |
| Hanna | 14,822.00 | 45,489.15 | (7,600.00) | 52,711.15 |

No costs awarded.

DONALDSON, C.J., and BISTLINE, J., concur.

SHEPARD, J., dissents and would not modify the Court's opinion of October 12, 1983.

BAKES, Justice, dissenting:

I dissent from the action taken by the majority upholding the previous opinion issued on October 12, 1983 (after again modifying the judgment downward). The errors committed in this case are sufficiently egregious, when viewed on the whole, to

warrant an outright grant of a new trial on the issue of damages.[1]

The first error occurred in this case in the trial court's instructions to the jury on the damages. The special verdict given to the jury relating to damages stated:

"We, the jury, assess __[plaintiffs']__ damages against the Defendants as follows:

A. Compensatory damages $_____
B. Punitive damages $_____"

Only three instructions were given on damages.[2] Instruction 24 stated that compensatory damages consisted of (1) property damage, and (2) "special or consequential damages." While Instruction 24A defined what property damage was, nowhere in the instructions was the term "special" or the term "consequential" damages defined. The instructions totally failed to inform the jury as to the elements of, or what constituted consequential or special damages. Because of this initial error in failing to instruct on the definition of these elements of damages, the jury understandably considered and awarded improper damages in this category, such as out-of-pocket attorney fees and damages for mental suffering, which even the trial court later recognized were improper when he shifted those elements out of the compensatory damages category awarded by the jury and put them in the punitive damages category.

The second major error occurred when the court refused the defendants' request to poll the jury to determine how they arrived at their verdict after it was obvious that an error had been committed by the jury in calculating the damages.

"MR. SMITH: Yes, if the Court please. I would request that the jury also be polled with this question:

"Did any of you jurors copy off or reduce to writing any of the charts or summaries or figures therefrom which were used by plaintiffs' attorneys, Verbillis or Wilde, during the course of final argument on December 7, 1979?

"If the answer is, yes, I would request that the further question be made.

"Were such writings used in the discussion and deliberation of the jurors in reaching their award of damages for any of the plaintiffs?

"THE COURT: I think that would be an invasion of the jury process, Mr. Smith. I will deny your motion.

---

1. However, while I would grant a new trial on damages, since a new trial on the issue of damages is not going to be ordered by this Court the reduction of damages set out by Justice Huntley in the present majority opinion is appropriate.

2. "INSTRUCTION NO. 24
"If you decide for the Plaintiffs on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate them for any of the following elements of damage proved by the evidence to have resulted from the conduct of the Defendants:
"1. The amount established by the evidence as and for property damage. This amount includes the differences, if any, between the contract purchase price as to each particular parcel, and the actual value at the time of the sale.
"2. The amount of money each Plaintiff is entitled to as a result of special or consequential damages which are the natural result of the Defendants fraud.
"The above two elements are known as compensatory damages; and
"3. Punitive damages, which is more fully explained elsewhere in these instructions.
"Whether any of these elements of damages has been proved by the evidence is for you to determine.

"INSTRUCTION NO. 24A
"You are instructed that, as to the property damage aspect in a misrepresentation case, the proper element of damages is the difference between the contract sale price and the actual value of the property bought.
"The reasonable cost of supplying or repairing the parts necessary to put the property in the condition it was represented it would be in is proper evidence for you to consider in determining the difference between the purchase price and the actual value of the property bought.

"INSTRUCTION NO. 25
"If you find that the defendants' conduct which proximately caused injury to the plaintiffs was fraudulent, and if you believe that justice and public good require it, you may, in addition to any damages to which you find plaintiffs entitled, award to the plaintiffs an amount which will serve to punish the defendants and to deter others from engaging in similar conduct. Such an award must bear some reasonable relation or proportion to the actual damages, the cause thereof, the conduct of the defendants, and the objective of deterrence."

"MR. HAMAN: Let the record show, Defendant, Sprinkel, joins in that request, your Honor.

"THE COURT: Motion is denied."

Stopping at that point to determine the source of the obvious error would have alleviated any problem of impeaching or clarifying the verdict at a later point. If the verdict was obviously in error, as later indicated by the trial court, the jury should never have been dismissed without first correcting the verdict. All of the problems that have arisen as the result of the trial court's amendment of the verdict directly result from the failure of the trial court to investigate the problem before discharge of the jury and correct it at that point. *See Bates v. Price,* 30 Idaho 521, 166 P. 261 (1917) (if verdict is irregular, it is duty of court to send jury back to correct it).

The third major error occurred when the trial court modified the verdict based upon affidavits of the jurors that were procured without notice to the defendants, in violation of the Code of Professional Responsibility, Rule 7–108(D). That rule requires that any contact with the jury after their discharge be accompanied by or following reasonable notice to the opposing counsel and other interested counsel. Plaintiffs' counsel failed to follow this rule in obtaining the affidavits of the jurors, depriving the defendants' of their basic right to be notified and have the opportunity to be present. The trial court then erred in using those affidavits to rework the verdict, instead of reworking the verdict upon information obtained in open court from a polled jury in which both counsel were permitted to participate. The very type of information which the defendants sought in open court, and which was denied to them by the trial court, was then obtained by the plaintiffs in violation of Rule 7–108(D) [3] and used by the trial court in reworking the verdict.

The next major error occurred when the trial court moved certain elements of damages from the award of compensatory damages to the award of punitive damages. This action resulted in an increase of the award of punitive damages from the jury's figure of $54,500 to the trial court's figure of $196,558.95. There is no indication that the jury, in awarding $54,500 "to punish the defendants and to deter others from engaging in similar conduct," would have agreed to increase that figure to over $196,000 if some of the compensatory damages awarded were legally improper. While it is apparent that the jury intended to punish the defendants, it is not apparent that they intended to punish the defendants to the extent allowed by the trial court's reworking of the jury verdict, which raised the jury's award of punitive damages approximately $142,000.

By this point it should have been obvious to all that a new trial was necessary because the previous verdict was by now hopelessly mired in controversy, and barely resembled the original verdict returned by the jury. However, this Court then took it upon itself to make a further change in the verdict, reducing the punitive damages awarded to $117,458.95, because of an alleged double recovery of attorney fees. Then, on rehearing, this Court has again reworked the "verdict of the jury" by disallowing a further one-third sum allegedly awarded as attorney fees. By now, a verdict of the jury which existed at one point in time no longer exists except possibly in the minds of the jury.

Accordingly, I believe fairness requires that the appellants be given a new trial on the issue of damages. It is obvious that the jury was confused on the damages issue because of the inadequate instructions. The trial court expressly said so and used that confusion as his justification for re-

---

**3.** Nothing in the record suggests that the failure in this case to comply with Rule 7–108(D) was knowing or willful, and the defendants do not make that charge. Their complaint is that, while the jury was still in court, they requested permission of the trial court to interrogate the jury on the same matters which were later included in the affidavits taken without notice to them, and they were refused.

716

working the jury's verdict. That confusion resulted from the fact that the trial court did not instruct the jury as to what constituted compensatory damages in this case. In *Shields v. Morton Chemical Co.*, 95 Idaho 674, 518 P.2d 857 (1974), we held that even though each of the instructions given to the jury was proper, in effect an improper grouping of them constituted reversible error. How much more so should we reverse the damages award in this case because of the failure to adequately instruct, the obvious confusion found both by the trial court and this Court, and the reworking of jury verdicts based upon affidavits of jurors, taken without notice, when the other party was denied the opportunity to attempt to elicit the same information in open court, where both parties could participate.

Accordingly, I dissent.