721 P.2d 179

Margaret **BAINBRIDGE**, Claimant-appellant, Cross respondent,

v.

**BOISE CASCADE PLYWOOD MILL**, Employer,

and

**Northwestern National Insurance Company**, Surety, Defendants-respondents, Cross appellants.

No. 15649.

Supreme Court of Idaho.

June 2, 1986.

Rehearing Denied July 24, 1986.

John F. Greenfield, Boise, for claimant-appellant, cross respondent.

John W. Barrett, of Moffatt, Thomas, Barrett & Blanton, Boise, for defendants-respondents, cross appellants.

BAKES, Justice.

Margaret Bainbridge (claimant) appeals the decision of the Industrial Commission dismissing her claim for worker's compensation benefits for failure to file her claim within the statutory time period. Boise Cascade Corporation (employer) through its surety, Northwestern National Insurance Co., cross appeals the commission's finding that claimant has presented a *prima facie* case of disability related to an occupational disease. We affirm the commission's finding that claimant failed to file a claim within the required time period. As a result, we do not reach the question of whether claimant has established a *prima facie* case of an occupational disease.

Claimant began working for employer at its Emmett plywood assembly plant in September, 1979. She worked at a glue booth, patching holes in and otherwise preparing wood sheets prior to their assembly in plywood form. The glue booth where claimant worked was in close proximity to saws in the actual assembly area where the wood sheets were glued together to form the finished plywood. The glue resin was applied to the wood sheets by spraying. Thus, at her work place, claimant was exposed to sawdust and glue fumes. Shortly after beginning her employment in 1979, claimant developed a cough. She consulted Dr. Paul McConnel, a family practitioner, who diagnosed her condition as bronchitis with flu. Claimant's cough persisted and in January, 1980, Dr. McConnel treated claimant again for her cough and, in addition, for a rash and for a pre-existing asthma condition.[1] Dr. McConnel initially treated claimant's condition with antibiotics. However, the medication seemed to have little effect in alleviating her symptoms.

In April of 1981 claimant continued to suffer from her asthma condition, and Dr. McConnel prescribed asthma medication. At a subsequent examination in July, 1981, Dr. McConnel noticed that claimant's asthma had improved following claimant's one-week absence from work. The following month, on August 31, 1981, claimant returned to Dr. McConnel, complaining of difficulty breathing with exertion. At this point Dr. McConnel apparently suspected claimant's work environment to be related to her asthma symptoms. Dr. McConnel arranged for a pulmonary function test to be conducted on September 4, 1981. He recommended that claimant discontinue working until the pulmonary function test could be completed. Claimant ceased work on September 3, 1981. Following a month off work, claimant appeared to improve, and Dr. McConnel issued a note to claimant to be given to her employer. This note, dated October 30, 1981, was delivered by claimant to the employer on October 31, 1981. In that note, Dr. McConnel recommended that claimant refrain from working indefinitely, noting that she had asthma reaction "to dust and chemical fumes." However, in the same note, Dr. McConnel also stated that claimant "could work in a clean environment." Claimant applied for and received non-occupational disability benefits through employer's non-occupational disability insurer, First Far West Corporation. Claimant's medical expenses during her employment were covered by her employer's group health insurance carrier, Blue Shield of Idaho, Inc.

Claimant did not return to work following the September 4, 1981, pulmonary testing and voluntarily terminated her employment in May, 1982. Claimant received non-occupational disability benefits from Sep-

---

1. It was Dr. McConnel's opinion that claimant's asthma predated her employment with employer but was asymptomatic and aggravated by her work environment. The specific agent blamed for claimant's aggravated symptoms was the formaldehyde present in the glue resin. Expert medical testimony before the commission indicated that formaldehyde could produce the symptoms claimant was suffering. However, that same testimony also indicated that heavy cigarette smokers were exposed to significant amounts of formaldehyde which would also produce the same symptoms. In this respect it is important to note that the medical history of claimant, as given by her physician, Dr. McConnel, indicates that claimant has been a heavy smoker since age 15, averaging 1½ to 2 packs of cigarettes per day up until 1980 when she cut back. She quit smoking altogether in December, 1982.

tember 4, 1981, through August, 1982, at which time benefits ceased. Claimant first filed a claim for worker's compensation benefits on November 26, 1982. On that date she filed both her *claim* for benefits and her *application for hearing* with the Industrial Commission. At the hearing before the commission, the employer through its surety moved to have claimant's claim dismissed on grounds that it was barred by the statute of limitations contained in I.C. § 72–448. The commission specifically found that claimant failed to file her claim for disability within one year after manifestation of an occupational disease and therefore dismissed her claim.

On appeal claimant contends that the commission erred in its application of the statute of limitations in that: (1) the employer's failure to file a report of the occupational disease as required by I.C. § 72–602(1) operates to toll the limitation imposed by I.C. § 72–448; and (2) employer's payment of medical expenses and non-occupational disability benefits operated to change the applicable statute of limitations from one year under I.C. § 72–448 to five years under I.C. § 72–706(2). We disagree and affirm the Industrial Commission.

I

The workman's compensation law provides compensation to employees who suffer disability as a result of an industrial accident or an occupational disease arising out of the course of employment. A review of the statutory provisions reveals that some apply strictly to occupational disease while others apply strictly to industrial accidents. Such is the case regarding statutes of limitations imposed on *claims* for disability.

I.C. § 72–701 contains the statute of limitations applicable to *claims* for disability resulting from industrial accidents.[2] By its express language it applies to claims arising from accidents, not to claims for disability arising from an occupational disease. The applicable statute of limitations for *claims* for disability resulting from occupational disease is found in I.C. § 72–448.[3] Both sections, however, impose the same limitation on claims for disability, namely, "within one (1) year after the date of the accident," I.C. § 72–701, or "within one (1) year after manifestation of the disease." I.C. § 72–448(1). Claimant does not contend her claim was filed within the applicable statutory period. Rather, she contends that the failure of Boise Cascade to file a report of the occupational disease as required by I.C. § 72–602(1) operates to toll the limitation imposed by I.C. § 72–448. Claimant's argument is based on her proposed interpretation of I.C. § 72–604. That section states:

"**72–604. Failure to report tolls employee limitations.**—When the employer

2. **72–701. Notice of injury and claim for compensation for injury—Limitations.**—No proceedings under this law shall be maintained unless a notice of the accident shall have been given to the employer as soon as practicable but not later than sixty (60) days after the happening thereof, and unless a claim for compensation with respect thereto shall have been made within one (1) year after the date of the accident or, in the case of death, then within one (1) year after such death, whether or not a claim for compensation has been made by the employee. Such notice and such claim may be made by any person claiming to be entitled to compensation or by someone in his behalf. If payments of compensation have been made voluntarily or if an application requesting a hearing has been filed with the commission, the making of a claim within said period shall not be required.

3. **72–448. Notice of contraction of disease and claim for compensation.**—(1) Except in

cases of silicosis for which notice of contraction and claim for compensation may be given at any time within the four (4) year limitation provided in section 72–439, unless written notice of the manifestation of an occupational disease shall be given by the employee to the employer within sixty (60) days after the first manifestation thereof, and within five (5) months after the employment has ceased in which it is claimed the disease was contracted, and, in case of death, unless written notice of such death be given within ninety (90) days after the occurrence and *unless claim for disability or death shall be made within one (1) year after manifestation of the disease or death respectively, all rights to compensation for disability or death from injury due to an occupational disease shall be forever barred.* (Emphasis added.)

has knowledge of an occupational disease, injury, or death and *willfully* fails or refuses to file the report as required by section 72–602(1), Idaho Code, the notice of change of status required by section 72–806, Idaho Code, the limitations prescribed in section 72–701 and section 72–706, Idaho Code, shall not run against the claim of any person seeking compensation until such report or notice shall have been filed." (Emphasis added.)

Claimant's reliance on this provision is misplaced. The express and specific language of Section 72–604 only tolls the limitations contained in Section 72–701 and Section 72–706. It makes no reference to I.C. § 72–448. In essence, claimant invites this Court to place a judicial gloss on 72–604 so as to make its tolling provisions applicable to the statute of limitations contained in I.C. § 72–448. We decline claimant's invitation to do so, especially given the legislature's clear intent to the contrary.[4] Statutes of limitations are clearly creatures of legislative enactment and not within the domain of the judiciary to impose. We will not usurp a clearly legislative prerogative. The commission correctly concluded that I.C. § 72–604 does not apply to I.C. § 72–448.

■ Even if § 72–604 were applicable to § 72–448, it only tolls limitations for *willful* failure to file the required report. The commission found that employer's failure to file the § 72–602 report was not willful. In its written opinion on rehearing, the commission expressly acknowledged and followed our definition of "willful" set out in *Smith v. Idaho Dept. of Employment,* 107 Idaho 625, 691 P.2d 1240 (1984), another Industrial Commission case, in which

this Court "reaffirmed earlier Idaho case law indicating that 'willful' implies a conscious wrong." 107 Idaho at 628, 691 P.2d at 1243. Applying this Court's definition of "willful" the commission concluded "that the evidence does not establish a willful failure on the part of the employer to make the required report." This finding by the commission is supported by the following substantial competent evidence in the record. Both claimant and employer's office manager, Mrs. Deanna Martin, testified that when claimant presented the note from Dr. McConnel on October 31, 1981, there was never any discussion that her condition was work related. Indeed, prior to that time claimant had filed several applications for non-occupational disability benefits in which she represented that her preexisting asthma condition was not work related. Claimant made similar representations in her applications filed after the October 31, 1981, meeting. Additionally, Mrs. Martin, the employer's office manager, testified that her understanding of Dr. McConnel's October 31, 1981, note was that claimant had merely aggravated her prior non-work related asthmatic condition. The note itself contains no specific language indicating that claimant's underlying condition was caused by her work environment. Employer's failure to draw from the note an inference to the contrary (*i.e.,* that claimant's asthma was caused by her work environment) is at most a simple misunderstanding of Dr. McConnel's intent in issuing the note. Any subsequent failure to file the § 72–602(1) report would be based on that misunderstanding. As we indicated in *Smith v. State Dept. of Employ-*

---

4. I.C. § 72–604, like I.C. § 72–448, was added to the present statutory compilation in 1971, and both were amended during the 1978 legislative session. Thus, at the time of the last legislative action on these two sections, the legislature was fully aware that § 72–604 contained no reference to I.C. § 72–448. Additional facts indicate that the failure to include 72–448 within the purview of 72–604 was intentional rather than an oversight by the legislature. Prior to the 1978 amendments the limitations contained in § 72–701 applied to both accidents and occupational disease. *Smith v. I.M.L. Freight, Inc.,* 101

Idaho 600, 619 P.2d 118 (1980). Thus, prior to the 1978 amendment of § 72–604, that section would have tolled the limitation on claims for occupational disease as contained in § 72–701. However, during the 1978 legislative session, I.C. § 72–701 was amended to delete any reference to occupational disease. The combined amendments of I.C. §§ 72–448, –604, and –701 make the legislative scheme abundantly clear. I.C. § 72–604 does not apply to limitations for filing *claims* arising from an occupational disease.

*ment, supra,* misunderstanding or otherwise negligent omission to report required information will not support a finding that such an omission or failure to report is "willful." 107 Idaho at 628, 691 P.2d at 1243, *quoting Meyer v. Skyline Mobile Homes,* 99 Idaho 754, 761, 589 P.2d 89, 96 (1979).

## II

■ Claimant next contends that payment of non-occupational disability and medical benefits by employer effectively changes the one-year statute of limitations imposed by I.C. § 72–448 to a five-year statute of limitations imposed by I.C. § 72–706(2). However, once again, claimant's reliance on the provisions of I.C. § 72–706 is misplaced, for two reasons. First, that section's statute of limitations does not apply to the time for filing claims for disability, but rather applies to the time for filing *applications for hearings* before the Industrial Commission. In this case the commission dismissed for failure to timely file the claim, not for failure to timely file an application for hearing. Accordingly, I.C. § 72–706 is inapplicable.[5]

■ Secondly, and more importantly, 72–706(2) only extends the statute of limitations "when payments of *compensation* have been made and thereafter discontinued...." (Emphasis added.) There has been no payment of "compensation" in this case by the employer. "Compensation" is a word of art under the Workmen's Compensation Act and refers to income and medical benefits "made under the provisions of this law," I.C. § 72–102(5), (12), and (15). Payments made to an employee under group health policies or group disability policies are not payments "made under the provisions of this law," and accordingly the medical and insurance benefits paid under the group policies provided by the employer are not "payments of com-

pensation" within the meaning of 72–706(2), and for this additional reason I.C. § 72–706(2) is inapplicable on the facts of this case.

The Industrial Commission has correctly applied the law as set forth in I.C. § 72–448 to the facts of this case. The decision of the Industrial Commission barring claimant's claim based on the statute of limitations is affirmed. Accordingly, we need not address the issues raised by the employer and surety in their cross appeal. Costs to respondents. No attorney fees.

DONALDSON, C.J., and SHEPARD, J., concur.

HUNTLEY, Justice, dissenting.

I respectfully dissent and my reasons therefor require a statement of facts slightly expanded from that presented by the majority opinion.

At the beginning of her employment, Ms. Bainbridge did her patching work at what was known as "glue station No. 2," but soon switched to "glue station No. 4," where she worked for the remainder of her employment with Boise Cascade.

Ms. Bainbridge alleges that she regularly inhaled chemical fumes containing formaldehyde from the agent used in the gluing process and sawdust emitted from the machines located directly behind her which cut the plywood boards.

Soon after beginning work at Boise Cascade, Ms. Bainbridge developed a persistent, hacking cough and congestion in her lungs which she attributed to the flu. She eventually consulted a physician, Dr. McConnel, about the cough and congestion. Dr. McConnel prescribed general antibiotics which had limited effect.

Dr. McConnel began to suspect that Ms. Bainbridge's condition might be work-related in July and August of 1981, but he

---

5. The worker's compensation law as enacted establishes two sets of statutes of limitations, those applicable to the filing of *claims* for disability (I.C. § 72–448 and 72–701) and those dealing with filing *applications for hearing* before the Industrial Commission (I.C. § 72–706).

In the present case the Industrial Commission held that claimant's right to any benefits under the worker's compensation law was barred for failing to bring her *claim* within the prescribed one-year limitation period. Under the facts of this case I.C. § 72–706 is not implicated.

testified that he did not tell Ms. Bainbridge of such suspicions until October 31st, 1981, after he had conducted extensive pulmonary testing and confirmed his opinion. On October 31st, 1981, Dr. McConnel gave Ms. Bainbridge a note to take to her employer, stating "No work indefinitely. Has asthma reaction to dust and chemical fumes. Could work in a clean environment." Ms. Bainbridge took this note the same day to Deanna Martin, a personnel coordinator at the plant.

Deanna Martin admits that she received Dr. McConnel's note on that date, but claims that the note did not give her notice of an occupational disease or possible Worker's Compensation claim. In short, she stated that there was "no way" that such could be understood from the note.

Deanna Martin forwarded the note to Mr. Walsh, a personnel director for the plant. Mr. Walsh wrote to Dr. McConnel on December 9, 1981, requesting a clarification of the contents of the note of October 31st, 1981. Dr. McConnel, in his response dated December 17th, 1981, reiterated that "she will need to work in a clean environment ... that would mean no dust, no smoke, no petroleum product, particles in the air [sic] ...."

Despite Dr. McConnel's reiteration of Ms. Bainbridge's condition, Boise Cascade did not file a "notice of injury and claim for benefits" (hereinafter "Form 1"), as required by I.C. § 72–602.[1]

Ms. Bainbridge permanently ceased working for Boise Cascade in September 1981, but remained on the roll as an employee until May of 1982. During that approximate eight month period, Ms. Bainbridge's medical expenses were paid under the employee Blue Shield disability benefit plan which paid for all medical payments without a deductible required, with Boise Cascade also paying all premiums. Ms. Bainbridge continued to have her medical expenses covered until August of 1982, more than three months after she had officially ceased to be employed by Boise Cascade.

Ms. Bainbridge contends that it was not until the insurance payments stopped that she realized that Boise Cascade was not assuming responsibility for her condition. She then contacted an attorney. Ms. Bainbridge's workers' compensation claim and notice for hearing were filed simultaneously on November 26, 1982, one year and twenty-six days after she first learned that her disease was caused by her work environment. Boise Cascade filed a motion to dismiss on the basis of Ms. Bainbridge's failure to file within one-year from the date of learning her condition was job-related as required by I.C. § 72–448(1).[2] The Industrial Commission found that, while Ms. Bainbridge had proved a prima facie case of industrial causation of an occupational disease, her claim was barred by that statute of limitations.

Ms. Bainbridge appeals the Industrial Commission's statute of limitations ruling, while Boise Cascade and Northwestern Na-

1. I.C. § 72–602 provides:

**72–602. Employers' notice of injury and reports.**—(1) First report—Notice of injury or occupational disease. As soon as practicable but not later than ten (10) days after the occurrence of an injury or occupational disease, requiring treatment by a physician or resulting in absence from work for one (1) day or more, a report thereof shall be made in writing by the employer to the commission in the form prescribed by the commission; the mailing to the commission of the written report within the time prescribed shall be compliance.

2. **72–448. Notice of contraction of disease and claim for compensation.**—(1) Except in cases of silicosis for which notice of contraction and claim for compensation may be given at any time within the four (4) year limitation provided in section 72–439, unless written notice of the manifestation of an occupational disease shall be given by the employee to the employer within sixty (60) days after the first manifestation thereof, and within five (5) months after the employment has ceased in which it is claimed the disease was contracted, and, in case of death, unless written notice of such death be given within ninety (90) days after the occurrence and unless claim for disability or death shall be made within one (1) year after manifestation of the disease or death respectively, all rights to compensation for disability or death from injury due to an occupational disease shall be forever barred.

tional Insurance Company cross-appeal on the issue of whether Ms. Bainbridge has proven a prima facie case for industrial causation of an occupational disease. I would reverse as to the former ruling, and affirm the latter.

## THE STATUTE OF LIMITATIONS ISSUE

In deciding whether the Industrial Commission correctly applied I.C. § 72–448(1) to the facts of this case, one must analyze several related sections of the Worker's Compensation Law.

Two general rules of interpretation aid in this analysis; specifically, the rule favoring the construction which appears from the latest expression of the legislature, taking into account the statute's history and evolution through amendment, (*See Leliefeld v. Johnson*, 104 Idaho 357, 659 P.2d 111 (1983); *Mix v. Gem Investors, Inc.*, 103 Idaho 355, 647 P.2d 811 (Ct.App.1982); *Jones v. Morrison-Knudsen Co., Inc.*, 98 Idaho 458, 567 P.2d 3 (1977); *Beard v. Lucky Friday Silver-Lead Mines*, 67 Idaho 135, 173 P.2d 76 (1946).) and the rule requiring that the Worker's Compensation Law be construed liberally in favor of claimants. (*See Horton v. Garrett Freightlines, Inc.*, 106 Idaho 895, 684 P.2d 297 (1984); *Miller v. Amalgamated Sugar Company*, 105 Idaho 725, 672 P.2d 1055 (1983); *Jones v. Morrison-Knudsen Company, Inc.*, 98 Idaho 458, 567 P.2d 3 (1977); *In re Haynes*, 95 Idaho 492, 511 P.2d 309 (1973); *Burch v. Potlatch Forests, Inc.*, 82 Idaho 323, 353 P.2d 1076 (1960).)

Ms. Bainbridge bases her appeal on the contention that I.C. § 72–604 operates to toll the statute of limitations provided in I.C. § 72–448(1). I.C. § 72–604 reads:

**72–604. Failure to report tolls employee limitations.**—When the employer has knowledge of an occupational disease, injury, or death and willfully fails or refuses to file the report as required by section 72–602(1), Idaho Code, the notice of change of status required by section 72–806, Idaho Code, the limitations prescribed in section 72–701 and section 72–706, Idaho Code, shall not run against the claim of any person seeking compensation until such report or notice shall have been filed.

Conversely, Boise Cascade contends that I.C. § 72–604 specifically limits its application to I.C. §§ 72–701 and 72–706 and therefore the one-year limitation period provided by § 72–448(1) is not tolled. At this point, some discussion of these various sections, including their relevant legislative and case histories is needed.

I.C. §§ 72–701 and 72–706 are general limitations sections, applicable to both accidents and occupational diseases. In 1978, the legislature acted to delete from § 72–701 the words "except in cases of occupational diseases specially provided," thereby rendering I.C. §§ 72–101 through 72–805 applicable to occupational diseases (*See* Compiler's note, I.C. § 72–701) and establishing a general intent that occupational disease claims be treated in the same manner as non-occupational disease claims.

In further ascertaining the general scheme provided by these code sections, it is apparent that the primary goal of the Workers' Compensation Law is to provide compensation for injured workers unless the employer has been prejudiced by untimely notice. *McCoy v. Sunshine Mining Co.*, 97 Idaho 675, 551 P.2d 630 (1976); *Facer v. E.R. Steed Equipment Co.*, 95 Idaho 608, 514 P.2d 841 (1973); *Smith v. Mercy Hospital*, 60 Idaho 674, 95 P.2d 580 (1939).

I.C. § 72–704 highlights this axiom and provides:

**72–704. Sufficiency of notice—Knowledge of employer.**—A notice given under the provisions of section 72–701 or section 72–448, Idaho Code, shall not be held invalid or insufficient by reason of any inaccuracy in stating the time, place, nature or cause of the injury, or disease, or otherwise, unless it is shown by the employer that he was in fact prejudiced thereby. Want of notice or delay in giving notice shall not be a bar to proceedings under this law if it is

shown that the employer, his agent or representative had knowledge of the injury or occupational disease or that the employer has not been prejudiced by such delay or want of notice.

In the case at bar, it is apparent that Boise Cascade did, in fact, have notice of Ms. Bainbridge's potential claim almost immediately. The fact that Deanna Martin, individually, did not think that a valid claim for occupational disease had been stated in Dr. McConnel's note of October 31st, 1981, does not vitiate Boise Cascade's notice in any way.

I.C. § 72–703 provides in pertinent part:
**72–703. Giving of notice and making of claim.**—Any notice under this law shall be given to the employer, or, if the employer is a partnership, then to any one (1) of the partners. If the employer is a corporation, then the notice may be given to any agent of the corporation upon whom process may be served, or to any officer of the corporation, or any agent in charge of the business at the place where the injury occurred.

Ms. Bainbridge acted correctly in rendering timely notice to Boise Cascade. Having done so, the burden does not remain upon her to convince the employer's agent that her claim is, in fact, valid. It is sufficient that she provide them with notice that a claim may be forthcoming.

The Industrial Commission found that Dr. McConnel's note of October 31st, 1981, did, in fact, provide Boise Cascade with notice that Ms. Bainbridge might have a claim for industrial causation of an occupational disease, and found that the notice satisfied the 60 day requirement of I.C. § 72–448(1).[3] I concur.

Having notice, Boise Cascade was then obligated under I.C. § 72–602 to file Form 1, which it did not do. I.C. § 72–604 specifically provides that wilful failure by the employer to file Form 1 results in the statute of limitation being tolled.

In a two-prong argument, Boise Cascade urges that the statute of limitation is not tolled. First, Boise Cascade contends that its failure to file Form 1 was not "willful," as required by § 72–604, and second, that in any event, the limitations period in § 72–448(1) governs. I deal with each argument in turn.

I disagree with Boise Cascade's argument that its failure to file Form 1 was not "willful." It is a tenet of long-standing that the law does not require malicious intent to create a conscious wrong. *Archbold v. Huntington*, 34 Idaho 558, 201 P. 1041 (1921). Moreover, the fallacy in Boise Cascade's argument is well articulated in the recent Industrial Commission decision of *Garza v. Shaw Auto Parts, Inc.*, 85 IWCD 40, p. 875 (1985).

In *Garza*, the commission interpreted the application of the word "willful" in I.C. § 72–604, correctly noting that, if an argument similar to that posited by Boise Cascade in the instant case were accepted, a failure to file Form 1 would only be "willful" and in violation of § 72–604 where the employee could prove a malicious intent to frustrate a claim. The commission then stated, "[S]uch reasoning places upon a claimant a burden of proof greater than could have been intended by the legislature under the provisions of I.C. Section 72–604." *Id.* at 876.

The Industrial Commission correctly ruled that such a result is not in keeping with the general intent of the Worker's Compensation Law. Indeed, such an interpretation would place employees in the position of being wholly dependent on either the employer's largesse or stupidity in admitting its true motives in failing to file Form 1. Boise Cascade's interpretation of § 72–604 would reduce that section to an absurdity and is surely not in keeping with the intent of the legislature in enacting the section.

Once Deanna Martin, as an agent of Boise Cascade, received notice of Ms. Bain-

---

**3.** However, having ruled that the October 31, 1981 notice satisfied the 60-day notice requirement of I.C. § 72–448(1), the commission never-

theless found the claim barred by that same section's one-year statute of limitations for filing a claim.

bridge's possible claim for industrial causation of an occupational disease, Boise Cascade was obligated to file Form 1. Its failure to file such form, even when it had received timely notice of Ms. Bainbridge's claim, was "willful" under § 72–604.

I turn now to Boise Cascade's second contention, that violation of § 72–604 tolls only §§ 72–701 and 72–706, not § 72–448(1), and that Ms. Bainbridge's claim remains barred under that latter statute.

A reading of § 72–604 establishes the legislature's obvious intent to toll statutes of limitation where an employer has failed to file Form 1 and has "knowledge of an *occupational disease,* injury, or death . . . ." (Emphasis added.) However, § 72–448(1) provides in pertinent part:

> [U]nless claim for disability or death shall be made within one (1) year after manifestation of the disease or death respectively, all rights to compensation for disability or death from injury due to an occupational disease shall be forever barred.

The plain language of § 72–604 is, then, in direct conflict with the mandate of § 72–448(1).

In the past, this Court has held that where there is a conflict among code sections in the Worker's Compensation Law, we use the most recent pronouncements of the legislature and the stated objective of affording claimants a liberal, favorable construction of the code sections in guiding our resolution of the conflict. *Jones v. Morrison-Knudsen,* 98 Idaho 458, 567 P.2d 3 (1977).

In *Jones,* this Court held that where §§ 72–448(3) and 72–706(2) conflicted concerning how soon action must be taken by the claimant, § 72–706(2) would be controlling,

> [T]he legislative history of these statutes convinces us that I.C. § 72–706(2) should be controlling.

I.C. § 72–448(3) was a part of the original Occupational Disease Act of 1939 and was unchanged except for its citation by the 1972 recodification of the Workmen's Compensation Code. On the other hand, I.C. § 72–706(2) was amended by the legislature in the 1972 codification, specifically extending its applicability to occupational diseases.

. . . . .

We have also frequently stated that the Workmen's Compensation Act is to be construed liberally in favor of claimants. *Id.* at 464, 567 P.2d at 9.

In applying the precepts in *Jones* to the case at bar, I note that in 1978, legislative amendments extended the application of § 72–604 to include the tolling of § 72–706, a statute covering the tolling of statutes of limitation for both non-occupational disease claims and occupational disease claims where compensation to claimants has been discontinued. And, as already noted, the legislature acted to delete the exclusion of occupational disease claims from the general limitations scheme of the Workers' Compensation Law, as embodied in § 72–701.

Paradoxically, § 72–448(1) remained unchanged. I cannot, however, view the language of § 72–448(1) in a vacuum. Instead, it is incumbent upon this Court to read together all sections of applicable statutes to determine the legislative intent. *County of Bannock v. City of Pocatello,* 110 Idaho 292, 715 P.2d 962 (1986); *Umphrey v. Sprinkel,* 106 Idaho 700, 682 P.2d 1247 (1983); *Magnuson v. Idaho State Tax Commission,* 97 Idaho 917, 556 P.2d 1197 (1976).

The legislature has recently acted to provide a scheme whereby both non-occupational disease claims and occupational disease claims follow essentially the same filing process. In addition, the legislature has specifically provided for a five-year statute of limitations for the filing of claims where the claimant has had compensation for an accident or occupational disease discontinued, under § 72–706(2).[4]

---

4. I.C. section 72–706(2) provides:
 (2) When compensation discontinued. When payments of compensation have been made and thereafter discontinued, the claimant shall have five (5) years from the date of the accident causing the injury or date of first

In the instant case, Ms. Bainbridge received disability benefits through Blue Shield of Idaho, with all premiums and deductibles paid by Boise Cascade, until August 26, 1982, almost four months after her formal termination of employment at Boise Cascade. The payments were roughly between $148 and $160 per week, closely approximating worker's compensation disability payments.

Had Boise Cascade filed Form 1, as required by § 72–602, and had the payment been from Northwestern and not Blue Shield, their discontinuation in August 1982 would have activated the extended five-year statute of limitations under § 72–706(2).

An employer's actions can serve to estop its assertion of a bar under a statute of limitations. *Bottoms v. Pioneer Irrigation District*, 95 Idaho 487, 511 P.2d 304 (1973); *Frisbie v. Sunshine Mining Company*, 93 Idaho 169, 457 P.2d 408 (1969); *Harris v. Bechtel Corp.*, 74 Idaho 308, 261 P.2d 818 (1953). Since it was Boise Cascade's violation of § 72–602 and failure to initiate payments from the worker's compensation surety which foreclosed the application of § 72–706(2) in the instant case, Boise Cascade should be estopped from asserting the bar of § 72–448(1).

Moreover, and most importantly, in view of the intent evidenced by the legislative amendments of 1978 that § 72–604 apply to both occupational disease claims and non-occupational disease claims alike, the restrictive interpretation of § 72–448(1) sought by respondent would frustrate the overall scheme of the Workers' Compensation Law when its provisions are read as a whole.

Accordingly, Ms. Bainbridge's claim is not barred by the statute of limitations.

## THE CROSS–APPEAL

Boise Cascade and Northwestern National Insurance Company have cross-appealed

from the Industrial Commission's finding that Ms. Bainbridge did prove a prima facie case for industrial causation of an occupational disease.

It is well settled that findings of the Industrial Commission which are supported by substantial, competent evidence will not be reversed on appeal. *Miller v. Amalgamated Sugar Company*, 105 Idaho 725, 672 P.2d 1055 (1983); *Griffin v. Potlatch Forests, Inc.*, 93 Idaho 174, 457 P.2d 413 (1969); *Kiger v. Idaho Corporation*, 85 Idaho 424, 380 P.2d 208 (1963).

The record indicates that Ms. Bainbridge presented uncontested evidence that the combination of formaldehyde and sawdust particulates can, and often does, cause respiratory problems such as bronchial asthma. Ms. Bainbridge further presented uncontroverted evidence that, prior to her employment with Boise Cascade, a physical examination showed her lungs to be clear and that she was asymptomatic to bronchial asthma. Evidence that both formaldehyde resin fumes, at a level where they could be detected by smell, and sawdust particulates were present in and around "Glue Booth 4" was presented. Finally, Dr. Rupert Burtan testified that, in his expert opinion, Ms. Bainbridge's asthmatic condition was, "within a medical probability," caused by her work environment.

In light of this accumulation of evidence, one cannot conclude that the Industrial Commission did not have substantial, competent evidence upon which to base their finding that Ms. Bainbridge had presented a prima facie case of industrial causation of an occupational disease.

Boise Cascade urges that Ms. Bainbridge has not presented a prima facie case because NIOSH air quality standards permit formaldehyde levels of up to one part per million and the record provides no evidence indicating that the formaldehyde levels at

---

manifestation of an occupational disease, or, if compensation is discontinued more than five (5) years from the date of the accident causing the injury or the date of first manifestation of an occupational disease, within one

(1) year from the date of the last payment of compensation, within which to make and file with the commission an application requesting a hearing for further compensation and award.

the situs either reached or exceeded that level. However, to rest its case, as Boise Cascade does at this point, does not negate the prima facie case. The NIOSH standard only sets a parameter for measuring the toxicity of formaldehyde fumes alone. It does not purport to establish a safe level for the combination of formaldehyde and wood particulates. Indeed, Boise Cascade never addressed the issue of whether formaldehyde, at whatever level of concentration in the air, would be absorbed into the wood dust particulates thereby increasing either the concentration of formaldehyde or the toxic effect of the combination. Moreover, evidence was presented indicating that highly susceptible individuals could contract such asthma at a level below the NIOSH standard.

In response, Boise Cascade further argues that causation cannot be proven since Ms. Bainbridge never presented evidence indicating that she falls into the special category of persons hyper-susceptible and highly sensitive to formaldehyde fumes. Again, such an evidentiary omission does not negate the prima facie case. Indeed, such a showing would have been redundant, given the evidence put forth showing Ms. Bainbridge to have had clear lungs and to have been asymptomatic to bronchial asthma prior to working for Boise Cascade, and to have contracted an acute, chronic form of bronchial asthma within two months of beginning work at Boise Cascade.

Finally, Boise Cascade contends that the testimony of Dr. Burtan was impeached on cross-examination, since he then testified that even if the NIOSH level was *not* exceeded, there was causation to a very strong medical "possibility." Boise Cascade urges that Dr. Burtan's failure to state that a "medical probability," as opposed to "possibility," of causation would exist under such a scenario, coupled with claimant's failure to show whether NIOSH levels were in fact exceeded, render his opinion on causation untenable.

The fallacy in Boise Cascade's contention lies, again, in its assumption that claimant cannot prove her case in the absence of a definitive showing that NIOSH levels were exceeded. For reasons already stated, it was not incumbent upon Ms. Bainbridge to introduce NIOSH readings into evidence in order to prove a prima facie case. Hence, Boise Cascade cannot rely upon her failure to do so without first demonstrating that the NIOSH standards apply to the particular facts of this case. As already noted, Boise Cascade has shown no link between NIOSH standards covering formaldehyde concentrations alone and toxicity when wood particulates are found in conjunction with formaldehyde resin fumes. Accordingly, the Industrial Commission's determination on causation should be affirmed.

I would reverse in part, affirm in part, and remand for further proceedings consistent with this dissent.

BISTLINE, Justice, dissenting.

### I.

I am in complete agreement with what Justice Huntley has written, and accordingly, have concurred in his opinion.

### II.

Apparently unnoticed by any other member of the Court, the first finding made by the referee, although not truly a finding, is advice or a recitation which is somewhat unusual:

> The proposed Findings of Fact of the Referee are submitted in a light most favorable to the Claimant, since this matter is presently before the Commission on the motion of the Defendants to dismiss at the conclusion of the presentation of the Claimant's evidence on the issues raised by the motion. R., p. 8.

The referee, Robert C. Youngstrom, was 100 percent correct, assuming that by his statement he meant that he would accept as true all of claimant's evidence and every inference of fact which might be legitimately drawn therefrom. *Curtis v. Dewey*, 93 Idaho 847, 475 P.2d 808 (1970). Clearly, there was a tacit understanding between counsel and the referee that the

surety would not at that time present any case, and that the referee could evaluate the claimant's case under the principles which in a civil action apply to motions for a directed verdict. *See* Appendix A attached.

When consideration is given to the format which the parties and the referee agreed upon, it is clear that the referee's Finding No. XIV:

> The Defendants contend that the Claimant did not give written notice of the manifestation of the disease within sixty days as required by Section 72–448(1). The evidence shows that the only written notice furnished the Employer by the Claimant was Exhibit #5. Exhibit #5 does not specifically indicate that the Claimant had incurred an occupational disease due to her employment. Nevertheless, *the Defendant's personnel manager, upon receipt of the notice and conversation with the Claimant, understood that, at the very least, the Claimant's occupation had aggravated a condition to the point that the Claimant could not continue her employment at that time.* The Referee concludes that the Exhibit constituted sufficient written notice to the Employer of the manifestation of an occupational disease. The oral notice would also be sufficient to satisfy the notice requirement of 72–448 under *Miller.* R., pp. 17–18,

was proper. In fact, in view of the testimony of Deanna Martin, Appendix B attached, it would have been most unusual had the referee found otherwise. Justice Huntley's view that the cross-appeal taken by the surety and the employer is without merit is eminently correct.

Moreover, and more critical, and crucial to the referee's Conclusion No. III, which reads in part: "The evidence does not establish that the Employer wilfully failed or refused to file the report required by Section 72–602(1)," R., p. 20, a reading of the testimony of Mrs. Martin is convincing that the relevant portion of Finding No. XIV,

underscored above, is contradictory to and cannot support Conclusion No. III. The referee in this regard has apparently accepted the meaning of the word "willfully" as it is used in a criminal context, or, if in a civil context, then as an action which is based on malicious conduct and/or which seeks exemplary damages.

The word in question, however, is used in an entirely different sense, and reasonably can only be taken as meaning a failure to file a report which is a "knowing" failure, i.e., not accident or inadvertence. That "willful" (and "willfully") is a word of many meanings is readily re-ascertained by a cursory resort to *Black's Law Dictionary,* 5th ed., p. 1434. There, citing *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), we can learn that it is so even as practitioners know it is so: "Willful is a word of many meanings, its construction often influenced by its context." Not only giving consideration to what transacted as between claimant and Mrs. Martin, but considering also her slanted and reluctant testimony on being called *as a claimant's witness,* there should not be any reasonable belief other than that she consciously, voluntarily, and knowingly made the determination to not file a report as the law requires. Accordingly, *any* statute of limitations which would technically bar her claim for compensation was tolled under the provisions of I.C. § 72–604.

A few years ago (but not so long in time that is beyond my ken) this Court had before it the claim of *Fred Arnold v. Claude Lacey & Son,* 73 Idaho 1, 245 P.2d 398 (1952):

> The Board concluded that the claim against employer and surety for the alleged accident having been made at the latest June 9, 1949, and petition for hearing not having been filed until September 13, 1951, the claim was barred by the provisions of Sec. 72–407, I.C., and dismissed the claim. *Id.* at 3, 245 P.2d at 400.[1]

---

1. I.C. § 72–407, as pertinent, was also set out in the opinion:

 "Where a claim for compensation has been made, and no compensation has been paid

As pertinent to the issue now confronting us, the opinion also contains this information:

Appellant contends that Sec. 72–1001 I.C. was not complied with by the employer. Hence the claim is not barred. The statute, Sec. 72–1001 I.C., does not extend the statute of limitations for acts that are to be performed by the employee, but penalizes the employer in a sum not exceeding $500 for not complying with the section. Non-compliance with this section, assuming it was not complied with in this case, could not be construed as tolling or extending the mandatory provisions of Sec. 72–407 I.C. above quoted. *Id.* at 4, 245 P.2d at 401.

Section 72–1001, which now is to be found only in superseded Vol. 11 of the Idaho Code, requiring a report to be filed, applied only to injuries, fatal or otherwise. Specifically it did not apply to occupational diseases. It provided that for each offense the employer "shall be punished by a fine of not more than $500.00." Superseded Vol. 11, p. 411.

With the sweeping changes in the law of worker's compensation effected by the 1971 complete recodification, 1971 Idaho Sess. Laws, ch. 124, the case of *Arnold, supra,* had salutory effect. Chapter 6 of Title 72, Employer's Reports, was changed from what it had been under I.C. § 10–7001 to do away with any fine. Instead, the *clear intent of the new law was to give the working person,* whether injured *or having become afflicted with an occupation disease,* the benefit of an employer's failure to file a report:

**72–604. FAILURE TO REPORT TOLLS EMPLOYEE LIMITATIONS.—** When the employer has knowledge of an occupational disease, injury, or death and willfully fails or refuses to file the report

thereof as required by section 72–602(1), the limitations prescribed in section 72–701, shall not begin to run against the claim of any person seeking compensation until such report shall have been filed. 1971 Idaho Sess. Laws, ch. 124, p. 474.

In 1978 the legislature imposed a new reporting obligation upon employers. It did so by adding § 72–806 to chapter 8 of Title 72. I.C. § 72–806 has no application to Mrs. Bainbridge's case, other than to note the adding of the new section, Notice of Change of Status, the legislature added to I.C. § 72–604 the provision that failure to give the new notice required by § 72–806 would also toll employee limitations.

Apparently in recognition that the 1971 Act had specifically mentioned the limitations of § 72–701, but had not mentioned § 72–706, the 1970 amendment now included in § 72–706. *See* Appendix C attached, which is a photo-copy of the 1978 Session Laws.

Obvious to the extreme, to any person of reason, the 1978 legislature simply saw that it had earlier in 1971 omitted to mention specifically any of the limitations which apply to working people other than § 72–701. So § 72–706 was added, albeit not exactly according to cricket.[2] It was approved by the Governor on March 17, 1978. Under an entirely different bill, enacted as ch. 264 of the 1978 Session Laws, and which would be approved by the Governor on March 28, 1978, I.C. § 72–701 was amended to delete therefrom any reference to occupational diseases—although in the seven years intervening since 1971 it had been otherwise—and I.C. § 72–448 was amended to read as it now does. What was being accomplished in 1978 was, with regard to occupational disease, changing the limitations on an employee to be one year

thereon, such claimant shall have one year from the date of making such claim within which to make and file with the industrial accident board, an application demanding a hearing and an award under such claim.
\* \* \* \* \* \*
"In the event an application is not made and filed as herein provided, relief on any

such claim shall be forever barred." *Arnold, supra,* 73 Idaho at 3, 245 P.2d at 400.

**2.** It was not "cricket" because the title of the 1978 amendment did not include or even mention any amendment of § 72–604 which would include giving specific mention to § 72–706.

from date of *disablement* to one year from date of *manifestation,* and moving occupational disease limitations entirely out of § *72–701* where it had been partially at least since the 1971 recodification, *and was in place when § 72–701 was first referred to in the 1971 version of § 72–604.*

What can readily be made of this is that the 1978 legislature in specifically making mention of § 72–706 which it had not done in 1971, simply let specific mention of § 72–448 slip through the cracks, undoubtedly the result of confusion of having two different bills in the hoppers of both houses, and "occupational disease" formerly, since 1971, having been mentioned in § 72–701.

One has only to keep in mind that it was not the code headnoters who captioned the 1971 § 71–604, **"Failure to report tolls employee limitations,"** but rather that caption appears also in the 1971 Session Laws. No one should entertain any realistic doubt that victims of occupational disease were intended to benefit by the tolling as were victims of industrial injuries. Otherwise, there was no need whatever to even mention an "employer who has knowledge of an occupation disease ... and wilfully fails ... to file the report."

It will be a strange Supreme Court indeed which, in the face of the history attendant to I.C. § 72–604, will indulge in the fantasy that the 1971 legislature and in turn the 1978 legislature, purposefully intended to discriminate against victims of occupational disease. It would be a clear case of unequal protection under the laws, were it intentionally done. But it was not so done. In order to avoid an unequal protection problem, it is generally a court's obligation to interpret the legislative intent so as to comport with constitutionality—not unconstitutionality. Here, we should be quick to recognize the 1971 legislature's intent, and thereafter its inadvertence in 1978. Instead, we seem to have a majority unwilling to solve the problem in accordance with the purpose of the Workmen's Compensation law, I.C. § 72–201, 1971 Idaho Sess. Laws, p. 428, and the mandate

that it will be construed liberally in favor of the employee:

Process and procedure under the Workmen's Compensation Act are designed to be as summary and simple as is reasonably possible. I.C. 72–708. As this Court has held many times, the Act is to be construed liberally in favor of a claimant. The humane purposes which it seeks to serve leave no room for narrow, technical construction. *In re Haynes,* 95 Idaho 492, 511 P.2d 309 (1973); *Smith v. University of Idaho,* 67 Idaho 22, 170 P.2d 404 (1946). *Hattenburg v. Blanks,* 98 Idaho 485, 567 P.2d 829 (1977).

Note should be taken that unlike pre-1971 § 72–102 which mentioned only the injured worker, the first sentence of § 72–201 reads as to "the remedy of workmen against employers for injuries received *and occupational diseases contracted....*"

HUNTLEY, J., concurs.

### APPENDIX A

MR. BARRETT: ... And we at this point would move for a dismissal at the end of the claimant's case. It being our assertion that number one, there has been no causation proven in this case by any evidence that this lady's condition was caused by her work environment as an occupational disease as a matter of law.

I don't—no, I don't think, Your Honor, that you have had an opportunity to review, for example, the deposition testimony of Dr. Burtan or review the testimony of Dr. McConnel. I realize he testified here and this has been longer ago than I would like to think; but I doubt that you have had an opportunity with your schedule to review that transcript.

In keeping that in mind, I would have no objection at this point of going ahead and permitting counsel with what he desires. Let him save some money. Let us try to save some money, and we'll move for a dismissal at this point on the grounds as a matter of law.

No causation has been established; and furthermore, in this case, there has been no

evidence that there was any offending agent that is described in these proceedings that the defendant is being charged with, and furthermore the statute of limitation issue.

If the case is then decided against the claimant, that's the end of the case. If it's determined that, yes, there is sufficient evidence, then, the motion we make would be denied; and we could go forth with our evidence.

I have no objection to that. And it will save everybody time and money.

MR. GREENFIELD: I would have no objection to that either if—that way if you decide that I have established a prima facie case, I'll go ahead and put on my rating then.

MR. BARRETT: Then we'll put on our evidence to refute what he has got. In other words, handle it as a directed verdict as we would which, of course is permissible before the Commission, and this has been done on prior occasions.

THE HEARING OFFICER: Very well.

MR. BARRETT: We have no problem with that proposition.

MR. GREENFIELD: Let me understand what I'm getting into.

MR. BARRETT: You're not losing anything. If he says our motion to dismiss is denied because there is sufficient evidence on the issues, then, what you're permitted to do is go ahead and bring in your doctor, whoever he is, and your impairment rating, and you complete your case.

We then put on all our evidence.

MR. GREENFIELD: I much rather not do that, but if I have to, I will.

MR. BARRETT: All right. Frankly, I think that it is probably a practical way to take care of it because I don't intend to argue our motion to dismiss here; but it is my perception of this case as it stands right now that as a matter of law it is not compensable. I'm sure Mr. Greenfield disagrees with that.

MR. GREENFIELD: I do.

MR. BARRETT: But at least I'm confident enough at this point that I'm willing to go ahead with that.

THE HEARING OFFICER: Well, it sounds reasonable to me, also.

Let the record show that the claimant rests on all issues except the extent of permanent impairment and disability, and Mr. Barrett has moved to dismiss the application for hearing. Tr., Vol. 2, pp. 338–41.

## APPENDIX B

### DEANNA MARTIN,

a witness having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified as follows:

### DIRECT EXAMINATION

BY MR. GREENFIELD:

Q State your name, please.

A Deanna Martin.

Q Is it Mrs. Martin?

A Yes.

Q What is your occupation, ma'am?

A Personnel manager.

Q Personnel manager at Boise Cascade Plywood Mill in Emmett?

A Boise Cascade, Emmett complexes.

Q Okay.

You've been present during the testimony of Mrs. Bainbridge this morning, have you not?

A Yes.

Q And you heard her testimony regarding writing that she took to you on Halloween, 1981; is that right?

A Yes.

Q I am going to hand you what has been marked as Claimant's Exhibit No. 5.

Is that familiar to you?

A Yes, it is.

Q Okay.

Do you recall receiving that about Halloween of 1981?

A Yes, I do.

Q Do you—can you tell the Commission who in your plant at that time was responsible for filing Workmen's Compensation claims?

A They are initiated between the employee and the supervisor and then brought to me. I type the necessary forms, et cetera, and send them to the necessary places.

Q Is that at present or at the time that—

A At the time she brought me this, I was in charge.

Q You were in charge of filing the Workmen's Comp claims?

A Uh-huh.

Q But you didn't file one in this case, did you?

MR. BARRETT: Your Honor, I am going to object on the grounds that counsel is, I think, misleading here. He is talking about a responsibility for filing a claim. As I understand under the Workers' Compensation laws, the responsibility for filing the claim is with an employee. I'm going to object on the ground that this is an erroneous legal assumption to begin with, and it's misleading because of it. I would object on those grounds.

MR. GREENFIELD: Your Honor, I think it is perfectly clear from the language of 72602.

MR. BARRETT: Well, that refers to an employer's report of injury. That's not a claim.

MR. GREENFIELD: That's exactly what I am referring to.

MR. BARRETT: Oh, well, then I object on the ground that his nomenclature is absolutely confusing.

THE HEARING OFFICER: I think you could rephrase the question.

MR. GREENFIELD: All right.

Q (By MR. GREENFIELD) The notice of injury of the occupational disease, was that—did you fill those out as well?

A Yes.

Q So when you were advised that someone had contracted an occupational disease, it was your responsibility in October of 1981 to file the notice of injury; is that right?

A Yes.

Q Okay.

In this case, you did not, is that so?

A That is correct.

Q Can you tell the Commission why you did not?

A I have previous insurance papers that says it's nonindustrial related.

Q What insurance papers are those?

A First Farm West.

Q Do you have those papers here with you this morning?

A Yes, I do.

Q Would you get them out for me, so I can see what you are talking about.

A Uh-huh.

Q These papers you have contain information that indicated to you that it was a nonindustrial disease; is that right?

A Yes.

Q Okay. I see what you mean.

But when did you receive this information from Dr. McConnel indicating that the condition was not one which arose out of her employment?

A Okay. This—at the time I was not handling the insurance papers. Mr. Snyder was.

Q Okay.

A And it was received by him around the 6th of October.

MR. BARRETT: You have got to speak up a bit.

THE WITNESS: It was around the 6th of October.

MR. BARRETT: Of what year?

THE WITNESS: 1981.

Q (BY MR. GREENFIELD) Okay. And that indicated, as you said, that Dr. McConnel didn't think it was work related; is that right?

A Right.

Q And then later on October 31, 1981, you received a disability confirmation. The one we have talked about where Dr. McConnel states, "reaction to dust and chemical fumes"; is that right?

A Yes.

Q Okay.

Can you tell the Commission—was it your decision then not to make a Workmen Comp claim because of the previous information from Dr. McConnel?

A Yes.

Q How did you regard the information on the disability confirmation dated 10–30–81 that states, "Has asthma reaction to dust and chemical fumes"?

A Gee, it was an aggravation of her condition. She could not go back to work, but there was no way that said her work caused it.

Q Do you understand—

A With the previous information.

Q I understand.

Do you understand that an aggravation of a pre-existing condition can be compensable?

A In what manner?

MR. BARRETT: I am going to object. This calls for a legal conclusion.

MR. GREENFIELD: It calls for a conclusion. I'm not sure how legal it is.

THE HEARING OFFICER: Well, I'll overrule the objection.

MR. GREENFIELD: I'll restate the question.

Q (BY MR. GREENFIELD) Do you understand that an aggravation of a pre-existing condition can be compensable?

A I don't know in what manner that you are referring to?

Q If somebody had asthma and it was not caused at work—it was caused some place else—and had it, but that person worked with the asthma, and then that condition was aggravated by, let's say, dust and chemical fumes at work to the point that he wouldn't go back, would you regard that as a—would you regard that aggravation as something that would require you to file a Workmen's Compensation—

A Not with the information that I had from her doctor previously; that it was not work related—not caused at work.

Q So it's a causation question in your mind?

A Yes.

MR. GREENFIELD: Okay. I guess we ought to—

MR. BARRETT: Mark them all one exhibit, the whole thing.

MR. GREENFIELD: Yeah, let's do that. (Claimant's Exhibit 7 marked.)

MR. BARRETT: You may want to take—so it's not duplicating the record—well, you can put it in here because she received all that stuff. That's what you're concerned with. She got all that stuff that is in there. Why don't you staple that.

MR. GREENFIELD: I move admission of Claimant's Exhibit 7.

MR. BARRETT: We have no objection.

THE HEARING OFFICER: Exhibit 7 is admitted.

Q (BY MR. GREENFIELD) But the entire basis of your—of your action in filing this as a Workmen's Compensation claim is the information you got from Dr. McDonnel indicated 10–1–81 that checks the boxes "no" where it says, "His condition due to injury or sickness arising out of patient's employment." Isn't that the sole reason why you didn't file it?

A Correct.

MR. GREENFIELD: Okay. That's all I have. Thank you very much.

MR. BARRETT: Just a moment.

CROSS–EXAMINATION
BY MR. BARRETT:

Q All of the documents that are contained in Exhibit No. 7 with the exception of the first page were documents that were

submitted and you reviewed as you received them; is that correct?

A That is correct.

Q And then, of course, the first page—as I understand it, it was in the same file but had been completed by Mr. Snyder?

A That is correct.

Q Or signed by Mr. Snyder; is that right?

A Yes.

Q Would you regard a person who has asthma and is reported by the doctor to be unable to work in any dust or chemical filled environment as being a subject matter of a Workmen Compensation claim?

A No, I do not.

Q That is the information that you received from Dr. McConnel; is that not correct?

A That is correct.

MR. BARRETT: No further questions of this witness. Thank you.

MR. GREENFIELD: I have got just one.

REDIRECT EXAMINATION

BY MR. GREENFIELD:

Q Ma'am, do you know Dick Walsh?

A Yes, I do.

Q What was his—what his role in Workmen Compensation claims in the fall and winter months of 1981?

A He is in our Employee Relations Department. He has the same function as—coordinating and following through on any claims or any problems that we have in any manner.

Contractual or safety, et cetera.

Q Did he have something to do with this claim?

A Investigative as to Mrs. Bainbridge's condition and when she could return to work.

Q You don't investigate these things, but he does; is that right?

A Yes—well, that is correct, yes.

Q In this case, Mr. Walsh did get involved in investigating the case, didn't he?

A Yes.

Q Do you know why he did?

A To see when Mrs. Bainbridge was concerned as to when she would be returned to work and checking to verify her condition and what manner she could be returned to work in.

Q Did he work with you on the case after you received that disability certificate from Dr. McConnel on Halloween?

A No, it was later in the—probably the following year. If our employees are off extensively, we do try and check and see at which state they're in.

(Claimant's Exhibit 8 marked.)

Q (BY MR. GREENFIELD) I am handing you what has been marked as Claimant's Exhibit No. 8.

Could you tell us what that is.

A That's a letter from Dr. McConnel to Mr. Walsh.

Q Do you recall seeing that letter?

A Yes, I have a copy of it.

Q At the point in time that—it's dated when?

A December 17th, '81.

Q Just a month and a half after you received that disability certificate?

A Yes.

Q On Halloween of—

A Yes.

Q Do you remember discussing this case with Mr. Walsh after that letter came in?

A Some.

Q Did that letter from Dr. McConnel make any difference in your opinion as to whether or not you should file a Work Comp claim?

A No, sir.

Q Why not?

A She was—it was still not caused by industrial or industrial related. There are cases where people have injuries or sick-

nesses where they are limited with their restrictions; that they cannot come back at that time. So, for example, with a broken leg, they come back to work with a full release and find they can't stand yet. They are back off again. I don't file a Workmen's Comp case in that. This I considered the same.

Q If Dr. McConnel had stated to you that Mrs. Bainbridge had aggravated her asthmatic condition at work, would you have filed a Workmen Comp claim?

A If on the original form it was related to her job, I would have. At that time, it was filed non—

Q That's not quite my question.

Assuming the original form came where Dr. McConnel says—where it says work related and he checks no and assume he had written a letter to you saying that the asthmatic condition was aggravated by her work at Boise Cascade, would you then file a Workmen's Compensation claim or would you have stuck to your guns and not filed on the grounds that it was caused somewhere else?

A I would have probably continued this way with some checking up through the Safety Department or Employee Relations Department.

Q Sort of like the checking Mr. Walsh did?

A It would probably come out the same.

MR. GREENFIELD: Okay. Thank you. That's all I have.

I think I'm going to offer Claimant's Exhibit 8. It's the letter from Mr. Walsh.

MR. BARRETT: I have no objection to Exhibit No. 8 on the same basis as the other exhibits for the restrictive purpose for which it is being offered.

THE HEARING OFFICER: Exhibit 8 can be admitted.

MR. GREENFIELD: That's all I have of the witness, Your Honor.

MR. BARRETT: I take it, Mr. Greenfield, that we following this hearing can stipulate to the photocopying of the actual payroll records of the claimant that would indicate the periods of time she worked for Boise Cascade.

MR. GREENFIELD: Okay.

MR. BARRETT: Okay. I won't bother to take time of this witness. We have no further questions of this witness at this time, Your Honor.

APPENDIX C

C. 264 '78 IDAHO SESSION LAWS 589

SECTION 20. That Section 72-704, Idaho Code, be, and the same is hereby amended to read as follows:

72-704. SUFFICIENCY OF NOTICE -- KNOWLEDGE OF EMPLOYER. A notice given under the provisions of section 72-701 or section 72-448, Idaho Code, shall not be held invalid or insufficient by reason of any inaccuracy in stating the time, place, nature or cause of the injury, or disease, or otherwise, unless it is shown by the employer that he was in

98

fact prejudiced thereby. Want of notice or delay in giving notice shall not be a bar to proceedings under this law if it is shown that the employer, his agent or representative had knowledge of the injury or occupational disease, or that the employer has not been prejudiced by such delay or want of notice.

SECTION 21. That Section 72-706, Idaho Code, be, and the same is hereby amended to read as follows:

72-706. LIMITATION ON TIME ON APPLICATION FOR HEARING. (1) When no compensation paid. When a claim for compensation has been made and no compensation has been paid thereon, the claimant, unless misled to his prejudice by the employer or surety, shall have one (1) year from the date of making claim within which to make and file with the commission an application requesting a hearing and an award under such claim.

(2) When compensation discontinued. When payments of compensation have been made and thereafter discontinued, the claimant shall have five (5) years from the date of the accident causing the injury or date of first manifestation of an occupational disease, or, if compensation is discontinued more than five (5) years from the date of the accident causing the injury or the date of first manifestation of an occupational disease, within one (1) year from the date of the last payment of compensation, within which to make and file with the commission an application requesting a hearing for further compensation and award.

(3) Relief barred. In the event an application is not made and filed as in this section provided, relief on any such claim shall be forever barred.

SECTION 22. That Sections 72-224, 72-324, 72-420 and 72-421, Idaho Code, be, and the same are hereby repealed.

Approved March 28, 1978.