732 P.2d 260

**Tommy HARMON, Claimant-Appellant,**

v.

**LUTE'S CONSTRUCTION COMPANY, INC., Employer,**

and

**Industrial Indemnity Company, Surety, Defendants-Respondents.**

No. 16081.

Supreme Court of Idaho.

Dec. 26, 1986.

Rehearing Denied Feb. 11, 1987.

Emil F. Pike, Jr., Twin Falls, for claimant-appellant.

Alan K. Hull, of Quane, Smith, Howard & Hull, Boise, for defendants-respondents.

BAKES, Justice.

Claimant Tommy Harmon appeals a decision of the Industrial Commission denying his request to set aside a lump sum agreement between Harmon and his employer's surety which had previously been approved by the commission. Harmon contends that the lump sum agreement fails to adequately compensate him for permanent disability suffered as a result of an industrial accident and should be set aside on grounds of fraud. We affirm the commission's decision denying relief.

Claimant was injured in an industrial accident on September 29, 1980, while working as a hole digger for Lutes Construction Company. He sustained injuries to his spine (central disc herniation) when he slipped and was hit in the shoulder by a

hydraulic ram. Claimant was treated for his injuries by Dr. Robert J. Porter, an orthopedic surgeon in Twin Falls. Dr. Porter performed surgery to repair the herniated disk on November 4, 1980. Both that surgery and a subsequent exploratory surgery failed to relieve claimant of the pain he suffered following the accident. Claimant remained totally disabled from work following the first surgery, with significant residual pain. Claimant was subsequently enrolled in a physical rehabilitation program in Boise. In October of 1981, Dr. Porter rated claimant impaired to the extent of 20% of the whole man. It was Dr. Porter's opinion that claimant had stabilized from a physiological point of view and that further medical treatment would not be helpful. Both Dr. Porter and Dr. Robert Burton, a Boise neurologist to whom claimant was referred by Dr. Porter, agreed that there was a "functional" aspect to claimant's pain and that settlement of claimant's pending worker's compensation claim might relieve or reduce claimant's complaints of pain. Neither doctor felt that further medical treatment was appropriate.

Throughout claimant's treatment and recovery from his injury, claimant was in contact and consulted by agents of employer's surety. Once it became clear to the surety's representatives dealing with claimant's case that he could not return to heavy manual labor, these individuals discussed other employment opportunities with claimant. As a result of such discussions, claimant, in September and October of 1981, expressed an interest in pursuing self employment in a small business and indicated that he would prefer to receive a lump sum settlement of his worker's compensation claim rather than statutory periodic payments. Claimant desired to have a lump sum settlement in order to provide him with sufficient start-up capital to begin his small business. Pursuant to claimant's request, employer's surety prepared a lump sum agreement which awarded claimant

approximately $25,000.[1] The lump sum agreement was signed on October 20, 1981, and submitted to the Industrial Commission for its approval. The commission initially rejected the settlement "on the grounds that they thought that there wasn't sufficient medical justification to lump the case." The commission then received a report from one of claimant's treating physicians indicating that a settlement would be in claimant's best interests due to the apparent functional overlay to his complaints of pain. After receiving this report, the commission then approved the settlement agreement on November 16, 1981.

In May of 1983, over a year and a half after the settlement agreement was approved by the commission, claimant sought to have the commission set aside the agreement on grounds of fraud or manifest injustice. The commission denied claimant's request based on the following conclusion:

"Surety's actions in this case, in entering into a lump sum settlement with Claimant, were consistent with the recommendations of both physicians involved and consistent with Claimant's own expressed wishes. Nothing in the record indicates that Surety misled Claimant in any manner, or that Surety otherwise committed actual or constructive fraud. *Smith v. King,* 100 Idaho 331 [597 P.2d 217]; *Faw v. Greenwood,* 100 Idaho 387 [597 P.2d 1077]; *McGhee v. McGhee,* 82 Idaho 367 [353 P.2d 760]. At the time the lump sum settlement was entered into, Claimant was totally disabled from work, but both physicians and Claimant agreed that Claimant would most likely be able to participate in light duty self-employment once he had the funds to do so. Surety's execution of the lump sum settlement at Claimant's request was not fraudulent, and there is no basis in law for setting it aside at this time."

I

Claimant contends on appeal that the commission's decision is erroneous as a

---

**1.** The award included payments already made for total temporary disability benefits, a sum of about $7,500.

matter of law and without support in the record. We find claimant's argument to be without merit.

The statutory scheme regarding workmen's compensation in general, and lump sum agreements in particular, is clear and must be given effect. A worker injured in an industrial accident is entitled to compensation for any resulting permanent disability. I.C. § 72–201 *et seq.* A determination of the degree of disability involves evaluations of both medical and non-medical factors. I.C. §§ 72–425, –430. The medical factors involve an evaluation of the claimant's permanent impairment pursuant to I.C. § 72–424.

> "72–424. **Permanent impairment evaluation.**—'Evaluation (rating) of permanent impairment' is a medical appraisal of the nature and extent of the injury or disease as it affects an injured employee's personal efficiency in the activities of daily living, such as self-care, communication, normal living postures, ambulation, elevation, traveling, and nonspecialized activities of bodily members."

The non-medical factors to be considered in making the disability evaluation include "age, sex, education, economic and social environment." I.C. § 72–425.[2] The purpose behind evaluating both medical and non-medical factors and, indeed, behind the award of permanent disability is to determine and "to compensate the claimant for his loss of earning capacity or his reduced ability to engage in gainful activity." *Baldner v. Bennett's, Inc.,* 103 Idaho 458, 461, 649 P.2d 1214, 1217 (1982).

■ Once a determination is made regarding the degree of a claimant's permanent disability, compensation for that disability may be awarded either through periodic payments, I.C. §§ 72–408, –409, or through a single lump sum payment, I.C. § 72–404. The particular method of compensation is left largely to the discretion of the parties, subject to the approval of the Industrial Commission, I.C. §§ 72–404, 72–711. However, once a lump sum compensation agreement is approved by the commission, that agreement becomes an award and is final and may not be reopened or set aside absent allegations and proof of fraud. I.C. § 72–718; *Vogt v. Western General Dairies,* 110 Idaho 782, 718 P.2d 1220 (1986); *Fountain v. T.Y. & Jim Hom,* 92 Idaho 928, 453 P.2d 577 (1969).

Since, in the present case, the compensation award was made by means of a lump sum agreement, the commission correctly held that Harmon's allegations of manifest injustice were insufficient, even if proven, to permit the commission to set aside the agreement. Thus, we find claimant's arguments on appeal that the commission erred in so holding to be without merit.

The only grounds sufficient to permit the commission to set aside claimant's award would be allegations and proof of fraud on the part of employer's surety in procuring the agreement. In order for claimant to succeed on grounds of fraud he must prove the following elements by clear and convincing evidence: " '(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.' " *Faw v. Greenwood,* 101 Idaho 387, 389, 613 P.2d 1338, 1340 (1980),

---

2. I.C. § 72–425 was amended subsequent to the time the lump sum agreement was approved by the commission in the present case. The amended version no longer lists the non-medical factors of "age, sex, education, economic and social environment," but instead refers to section 72–430. I.C. § 72–430 states that, in addition to physical disablement (impairment), consideration should be given "to the diminished ability of the afflicted employee to compete in an open labor market within a reasonable geographic area considering all the personal and economic circumstances of the employee and other factors as the commission may deem relevant," in determining a claimant's permanent disability above and beyond his impairment rating. In the present case, it makes little difference whether the preamendment or amended version is the applicable statute, since the record supports the finding that both the surety and the commission gave consideration to non-medical factors under either version.

*quoting Mitchell v. Siqueiros,* 99 Idaho 396, 401, 582 P.2d 1074, 1079 (1978).

The commission, after a full hearing, specifically found, citing *Faw v. Greenwood, supra,* that claimant failed in his burden of proof:

"Nothing in the record indicates that Surety misled Claimant in any manner, or that Surety otherwise committed actual or constructive fraud."

As we held in *Faw,* " '[W]hether fraud has been proven by clear and convincing evidence is for the determination of the trier of fact [and] [o]n appeal that determination will not be reversed where supported by competent, substantial, though conflicting evidence.' " *Faw v. Greenwood,* 101 Idaho at 389, 613 P.2d at 1340, *quoting Smith v. King,* 100 Idaho 331, 334, 597 P.2d 217, 220 (1979). We have examined the record in the present case and find the commission's determination supported by substantial competent evidence therein.

■ The record indicates that surety's agent, Mr. MacMillan, fully explained to claimant his compensation options. He explained the differences between a lump sum agreement and a regular compensation agreement. Claimant was told that under a regular compensation agreement periodic (monthly) payments would be made to compensate him for his disability and that he would be fully covered for any future medical expenses incurred as a result of his disability. He was further told that under a lump sum agreement his rights to future compensation and medical benefits would be foreclosed; the surety's liability for such amounts would be fully discharged upon its payment of the lump sum amount. The undisputed testimony before the commission was to the effect that a lump sum agreement was chosen at claimant's insistence. From the outset,

claimant expressed his desire for a lump sum settlement with each of the four people involved in his case: surety's rehabilitation nurse, the commission's two vocational rehabilitation counselors, and, finally, Mr. MacMillan, surety's claims examiner. Even after the settlement was initially rejected by the commission, claimant still maintained that he wanted the agreement approved. He desired a lump sum payment in order to start his small business.[3] Based on the testimony and evidence in the record, we hold the commission's decision regarding lack of fraud to be supported therein, and we affirm the same.

## II

As an adjunct to his claim of constructive fraud, claimant argues that his lump sum agreement failed to adequately compensate him for his disability because it failed to take into consideration non-medical factors in evaluating the degree of his disability. It would appear that claimant's argument is along the lines that the agreement, as approved by the commission, did not "adjudicate" disability insofar as non-medical factors are concerned. Therefore, claimant argues, the agreement may be set aside without allegations or proof of fraud. I.C. § 72-718. We likewise find this argument to be without merit.

■ As the proponent of a claim which entitles him to certain benefits, claimant bears the burden of proof in establishing his right to any such entitlement. Claimant bears the burden of proof in showing that the commission improperly denied him such benefits. In the present case, claimant does not even allege that either the surety, in drafting the agreement, or the commission, in approving it, were ignorant of claimant's "age, sex, education [or] economic and social environment."[4] Indeed,

---

3. Claimant repeatedly expressed his desire to Mr. MacMillan and the vocational rehabilitation counselors assigned to his case by the commission to receive a lump sum in order to buy a bar in Fairfield, Idaho. He needed approximately $20,000 to buy the business and therefore indicated that he preferred a lump sum settlement.

4. In fact, in its order denying claimant's request to set aside the lump sum agreement, the commission specifically mentioned claimant's age, level of education, and the working environment to which he had become accustomed. Such references by the commission clearly indicate that it was aware of those non-medical

to the extent the agreement awards compensation based on factors other than claimant's physical impairment, it is strong evidence that non-medical factors were given consideration in evaluating claimant's disability.

In the present case, the settlement agreement gives compensation to claimant apart from that given for his physical impairment. The agreement gives claimant approximately $11,000 for his physical impairment, leaving nearly $7,000 in compensation based on factors other than the medical factor of physical impairment. The agreement denominates this additional compensation as: "CONSIDERATION: Vocational Assistance, 52 wks. @ $132.00." In his testimony before the commission, Mr. MacMillan explained the purpose for this additional compensation. "[G]enerally, we would send somebody to school to retrain them. But in [his] case, since [he didn't] want to go to school or training, we [had] to provide some other means for [his] disability and we [could] provide ... it by paying [him] for what it would cost to send [him] to school." Thus, the amount given for "vocational assistance" clearly was intended to compensate claimant for disability unrelated to any medical factor.

Additionally, the agreement itself in unambiguous language expressly states the intent of the parties (claimant and surety) to settle and discharge "any and all claims of every kind and character" related to claimant's permanent disability. The determinative language in the lump sum agreement is found in the Fifth, Seventh and Eighth paragraphs:

"*FIFTH:* That a dispute exists between the parties as to the amount of *permanent disability.* That in order to settle

the dispute, the parties have mutually agreed to a Lump Sum Settlement subject to the following terms and conditions: ...."

"*SEVENTH:* Upon the Commission's Order approving this Agreement and subject to the payment of the settlement by the Employer-Surety, the *Employer-Surety shall be and by these presents are, fully, finally and forever discharged and released of and from any and all liability on account of the above alleged injuries.*

"*EIGHTH:* Claimant advises the Commission that he is not represented by counsel and he acknowledged that he has carefully read this Agreement and legal instrument in its entirety and understands its contents and has executed the same knowing that this agreement *forever concludes* and fully and finally disposes of *any and all claims of every kind and character* he has or may have in the future against the Employer-Surety on account of said injury *and that these proceedings are concluded and forever discharged and closed by reason hereof* subject only to the Commission's Order and approval."

It is clear that all claims regarding disability (as affected by both medical and non-medical factors) were fully settled by the agreement and fully adjudicated when the agreement was approved by the Industrial Commission. Therefore, pursuant to I.C. § 72–718, the lump sum agreement may not be modified by the Industrial Commission, absent allegations and proof of fraud by Mr. Harmon.[5]

 Finally, to the extent the lump sum agreement constitutes a valid contract between claimant and surety, it is governed

---

factors affecting claimant's "ability ... to compete in an open labor market." I.C. § 72–430.

**5.** It is interesting to note that in both his brief and at oral argument on appeal, counsel for claimant asserts a deficiency in the settlement agreement related almost entirely to *medical* factors. He argues that the agreement is unjust because claimant "continu[es] to suffer from *physical* problems related to his back injury, suggesting the likelihood of additional and, per-

haps, substantial *medical expense.*" It is certainly clear that the settlement agreement addressed the medical factors affecting claimant's disability, *i.e.,* medical factors clearly were adjudicated by the commission in approving the lump sum settlement agreement. Therefore, counsel's assertion regarding medical factors is of no avail. Such factors were adjudicated and therefore, absent allegations of fraud, may not now be set aside or modified.

by fundamental contract law principles. In such a light, the essence of Mr. Harmon's claim is that the Industrial Commission, and subsequently this Court, should reform or modify his contract with employer-surety. However, the lump sum settlement agreement is, as discussed above, an unambiguous and *final* expression of the parties. Any oral negotiations or agreements taking place prior to entering into the agreement are deemed merged therein and "will not be admitted to contradict the plain terms of the contract." *Ringer v. Rice,* 97 Idaho 105, 108, 540 P.2d 290, 293 (1975). Absent allegations and proof of fraud, Mr. Harmon's attempts to modify the contract, which became binding on the parties once approved by the Industrial Commission, violate the parol evidence rule. "[W]here a contract is clear and unambiguous not involving any absurdities or contradictions, it is the best evidence of the intent of the parties." *National Produce Distributors v. Miles & Meyer, Inc.,* 75 Idaho 460, 465, 274 P.2d 831, 833 (1954). There is no ambiguity in the lump sum agreement; therefore, the parol evidence rule bars any attempts by Mr. Harmon to modify or contradict the clear terms of the agreement based on preliminary negotiations or discussions with the employer-surety.

We affirm the commission's decision. Costs to respondent; no attorney fees.

DONALDSON, C.J., and SHEPARD, J., concur.

HUNTLEY, Justice, dissenting.

This is another in a series of several cases coming before this Court in the past four years where the industrial commission has approved settlements which misrepresent by their titles that which is in (i.e., missing from) the text.

There is at least one distinction in major substance between a "disability rating" and an "impairment rating." Claimants continuously suffer loss of benefits to which they are entitled because the commission frequently signs off on "disability ratings" which are in truth only "impairment ratings" because they do not contain either consideration of or award of compensation for the nonmedical factors.

It is disappointing that the court should place its stamp of approval on this depriving workmen of their entitlements. Often the value of the nonmedical factors (for which insurance premiums are paid, and for which the worker has surrendered his right to sue in tort) is as substantial as the impairment award.

THE FACTS

A more comprehensive statement of the facts than that presented by the majority is necessary to an understanding of the injustice being perpetuated here.

Claimant Tommy Harmon suffered an industrial accident on September 29, 1980, while working as a hole-digger for Lute's Construction Company. Harmon slipped and was hit in the shoulder by a hydraulic ram, sustaining an injury to his lumbar spine with resulting large central disc herniation between the fourth and fifth lumbar vertebraes. Harmon first went to a doctor in Gooding and, thereafter, was treated by Dr. Robert J. Porter, an orthopedic surgeon in Twin Falls.

Harmon did not improve with conservative back care and experienced an inordinate amount of pain. Additionally, Harmon experienced occasional numbness in his right leg.

Dr. Porter performed a laminectomy on November 4, 1980, designed to repair the herniation. Harmon's condition did not improve significantly after the surgery and he continued to experience severe pain and occasional numbness in the leg.

Harmon was rehospitalized toward the end of December, 1981, and on March 31, 1981, underwent further exploratory surgery of the lumbosacral spine. Again, the surgery failed to alleviate Harmon's condition.

Dr. Porter then referred Harmon to Dr. Robert Burton, a Boise neurologist. Dr. Burton recommended that Harmon be treated for his pain at the Elk's Rehabilita-

tion Center. He entered the center for two weeks on September 15, 1981. The Elk's program enabled Harmon to stop taking medication for his pain for awhile, although he continued to experience pain. On October 6, 1981, Dr. Porter rated Harmon impaired to the extent of 20% of the whole man.

During the course of his treatment, Industrial Indemnity Company of California, the surety, assigned Martha Peterson, a rehabilitation nurse; Jim Spooner, a field representative; and Don MacMillan, a claims manager, to monitor Harmon's progress and claim. After the second surgery, Mrs. Peterson made regular monthly visits to Harmon at his home and at the Elk's Rehabilitation Center. Several of Mrs. Peterson's reports indicate that neither she nor Jim Spooner foresaw an optimistic outcome for Harmon. In her report dictated July 13, 1981, Mrs. Peterson stated:

"Jim Spooner visited with Tom just before I arrived and I talked with Jim about it after we had both completed our visits. Jim and I both feel that having had two back surgeries within six months and having the residual that he is having that we are in definite trouble with this claim."

In a report dictated August 18, 1981:

"At this time, Tom continues to complain of severe low back pain, with right hip and leg involvement. He states that the pain goes clear to his toes. He is taking Darvocet N–100 for pain, but feels this is doing very little for him. His activities chiefly involve walking about the house and around the yard. He is essentially doing nothing and was again lying on the couch when I visited him today."

"Tom is certainly a bad case with his limited education and background and having two surgical procedures within approximately six months [sic] of time. ... I have talked with Jim Spooner again this month personally about Tom and he is working closely with him. At this time, he has no prospects for Tom because of his medical instability."

Finally, in a report dictated October 23, 1981, based upon a meeting with Harmon after his completion of the back program at Elk's Rehabilitation Center, Mrs. Peterson noted that Harmon "continues to complain of low back pain with right hip and leg involvement and some numbness in the right leg." Also, Mrs. Peterson noted that Harmon was interested in buying a bar in Fairfield, Idaho. Mrs. Peterson reassured Harmon that Mr. MacMillan would visit Harmon soon to discuss his award and would bring a "comp agreement."

Don MacMillan received and read each of Mrs. Peterson's reports. Additionally, he met with Harmon while Harmon underwent treatment at the Elk's Rehabilitation Center, at which time Harmon expressed his interest in receiving a speedy settlement so he would have the funds to either buy a bar or open a wood-carving business.

After Harmon was released from the Elk's Rehabilitation Center, Don MacMillan met with Harmon on October 15, 1981, at Harmon's home, at which time MacMillan explained and outlined the differences between lump sum agreements and compensation agreements. (See, Descriptive Diagram, Defendants' Exhibit 24, attached hereto as Appendix A.) On October 20th, MacMillan and Harmon met again and negotiated a lump sum agreement for $17,-924, which sum included $500 for future medical expenses and $6,864 for institutional re-training for 52 weeks. Mr. MacMillan chose both figures personally, because "... I didn't think, in Tom's case, there would be anything that he would train for that would exceed 52 weeks." MacMillan chose the figure of $500 future medical expenses because "It's a round figure and it would be sufficient enough to take care of minor medical needs that he might need; medication, if he wanted to return to Dr. Porter." MacMillan did not contact Dr. Porter to ask whether or not $500 would in fact be a reasonable figure for future medical expenses.

At one point during MacMillan's explanations and the negotiation of a lump sum agreement, Harmon indicated that he

might contact an attorney, but that he wasn't sure why he should. MacMillan's response was, "I said something like, you could, but that's fine, but it wouldn't change our position any." Harmon did not retain counsel at any point prior to the signing and final approval of his lump sum agreement.

Harmon testified that he did not fully understand the distinction, explained to him by MacMillan, wherein only $500 of future medical expenses would be provided under a lump sum agreement as opposed to full coverage of five years' worth of medical expenses which would have been available under a compensation agreement. Harmon attributes, in part, this misunderstanding to the fact that he was taking pain medications and drugs continuously during the negotiation process.

The lump sum agreement was signed on October 20th, 1981, and was denied approval by the Industrial Commission on November 6, 1981. The lump sum agreement was rejected on grounds that the Commission could not find sufficient medical justification to lump the case.

After approval was denied, MacMillan contacted Dr. Robert Burton by telephone. MacMillan informed Dr. Burton that Harmon's condition had improved considerably since he was examined by Dr. Burton. Without examining Harmon, Dr. Burton wrote a report to the Commission indicating that a speedy resolution of Harmon's claim was in the best interest of Harmon and all concerned. Based upon this information, the Industrial Commission then approved the lump sum agreement. MacMillan based his opinion that Harmon had improved considerably upon his own personal meetings with Harmon, including the meeting on October 15, when, Harmon "looked well rested, clothes were clean, just didn't appear to be anything wrong with him. He gave no evidence of being in pain. He sat comfortably. Walked around comfortably. He talked freely. He was very optimistic, in fact. That's why I concluded he felt—looked good."

Since November 1981, Harmon has incurred hospital expenses of approximately $13,000 and, additionally, bills of between $3,000 and $4,000 owed to Dr. Porter. Harmon's pain still persists. The doctors agree that Harmon seems to have an abnormally low threshold to pain, but psychiatric testing has shown that the pain is "real to him." He has still not found gainful employment.

The Industrial Commission denied Harmon's request that his lump sum agreement be set aside after finding that no fraud on the part of Industrial Indemnity Company could be found and that, in the absence of fraud, I.C. §§ 72–718 and 72–404 prohibit the setting aside of lump sum compensation agreements.

The lump sum agreement awarded Harmon contained awards of $6,864 for retraining/vocational assistance for fifty-two weeks; $500 for future medical expenses; and $11,110 for 20% permanent impairment of the whole man rating, for one hundred weeks. There was no express mention in the lump sum agreement of any compensation for nonmedical factors as they impacted on Harmon. In short, there appears to have been no consideration whatsoever given to establishing Harmon's permanent partial *disability* (as distinguished from *impairment*) rating. In fact, no such rating was ever done by either Dr. Porter or the Commission.

The Idaho Worker's Compensation Law has, by separately codifying definitions of both permanent impairment and permanent disability, made it apparent that both ratings are discrete and distinct factors for consideration in worker's compensation awards. I.C. § 72–424 provides the definition of permanent impairment:

72–424, **Permanent impairment evaluation.**—"Evaluation (rating) of permanent impairment" is a medical appraisal of the nature and extent of the injury or disease as it affects an injured employee's personal efficiency in the activities of daily living such as self care, communication, normal living postures, ambulation,

elevation, traveling, and nonspecialized activities of bodily members.

I.C. § 72–425 contains the following language explaining permanent disability:

**72–425. Permanent disability evaluation.**—"Evaluation (rating) of permanent disability" is an appraisal of the injured employee's present and probable future ability to engage in gainful activity as it is affected by the medical factor of permanent impairment and by pertinent nonmedical factors provided in section 72–430, Idaho Code.

I.C. § 72–430 further provides:

**72–430. Permanent disability—Determination of—Percentages—Schedule.**— (1) Matters to be considered. In determining the percentages of the permanent disabilities less than total, account shall be taken of the nature of the physical disablement, the disfigurement if of a kind likely to handicap the employee in procuring or holding employment, the cumulative effect of multiple injuries, the occupation of the employee, and his age at the time of accident causing the injury, or manifestation of the occupational disease, consideration being given to the diminished ability of the afflicted employee to compete in an open labor market within a reasonable geographical area considering all the personal and economic circumstances of the employee, and other factors as the commission may deem relevant, provided that when a scheduled or unscheduled income benefit is paid or payable for the permanent partial or total loss or loss of use of a member or organ of the body no additional benefit shall be payable for disfigurement.

This court has previously recognized the distinction between permanent impairment and permanent disability in *Curtis v. Shoshone County Sheriff's Office*, 102 Idaho 300, 629 P.2d 696 (1981), wherein we stated:

Since these three statutory definitions [citations omitted] [for permanent physical impairment, permanent impairment and permanent disability] were passed simultaneously by the legislature, we can only conclude that the legislature intended that they define three different, but related, classifications.

*Id.* at 304, 629 P.2d 696.

One must bear in mind the distinction between permanent impairment and permanent disability as one analyzes I.C. §§ 72–718 and 72–719, which set forth the grounds upon which a decision of the Industrial Commission may be modified. I.C. § 72–718 states in pertinent part:

**72–718. Finality of commission's decision.**—A decision of the commission, in the absence of fraud, shall be final and conclusive *as to all matters adjudicated* by the commission upon filing the decision in the office of the commission; provided, within twenty (20) days from the date of filing.... (Emphasis added).

I.C. § 72–719 provides in relevant part:

**72–719. Modification of awards and agreements—Grounds—Time within which made.**—

....

(3) The commission, on its own motion at any time within five years of the date of the accident causing the injury or date of first manifestation of an occupational disease, may review a case in order to correct a manifest injustice.

(4) *This section shall not apply to a commutation of payments under section 72–404.* (Emphasis added).

The statutory mandate is clear, and must be given effect. *Umphrey v. Sprinkel,* 106 Idaho 700, 682 P.2d 1247 (1983). The only grounds upon which a lump sum agreement may be set aside or modified, subsequent to the time set for appeal, is fraud. *Fountain v. T.Y. & Jim Hom,* 92 Idaho 928, 453 P.2d 577 (1969). Therefore, the commission was correct in concluding that the Idaho law does not allow for the modification of lump sum agreements for either manifest injustice or mutual mistake of fact.

However, the issue still remains as to whether all aspects of the claim were "fully adjudicated," thereby precluding further consideration of additional factors not pre-

viously adjudicated. As I have already noted, ratings for permanent impairment and permanent disability are distinct and discrete factors for consideration in worker's compensation awards.

In *Woodvine v. Triangle Dairy, Inc.,* 106 Idaho 716, 682 P.2d 1263 (1984), this court interpreted the statutory mandate of I.C. § 72–718 in the context of compensation agreements. In *Woodvine,* we held compensation agreements are final and conclusive only as to those matters actually adjudicated by the Commission. In that case, we held that the failure to appraise for permanent disability rendered the agreement open to consideration of that factor:

> We conclude that the legislature, by adding the phrase "as to all matters adjudicated," [in enacting I.C. § 72–718 in 1971] intended that decisions of the commission be final and conclusive *only as to those matters actually adjudicated."* (*Woodvine,* 106 Idaho at 721, 682 P.2d 1263).

> This is a departure from the concept of "pure res judicata," applied prior to 1971, which accorded decisions by the commission finality and conclusiveness as to all matters which were, *or could have been,* adjudicated. (*Woodvine,* 106 Idaho at 721, 682 P.2d 1263). (*See also, Wolf v. Kaufman and Broad Home Systems,* 106 Idaho 838, 683 P.2d 874 (1984); *Banzhaf v. Carnation Company,* 104 Idaho 700, 662 P.2d 1144 (1983); *Fenich v. Boise Elk's Lodge No. 310,* 106 Idaho 550, 682 P.2d 91 (1984).

While *Woodvine, Fenich,* and *Wolf* all involved non-fully adjudicated compensation agreements, the analysis used in those cases is equally applicable in the context of lump sum agreements. Although there are valid reasons for the different standards in allowing for modification as between those two kinds of agreements, distinctions between compensation agreements and lump sum agreements are not meaningful in the context of ascertaining whether factors have been *fully adjudicated.* If a claim or entitlement has not been considered, fundamental fairness requires that a claimant not be precluded from being heard on the issue.

In the instant case, the lump sum agreement entered into by Harmon contains no mention of nonmedical factors used in assessing permanent disability. Indeed, Dr. Porter was never asked to, and never did, provide a permanent partial disability rating for Harmon. Further, the diagram McMillan drew illustrating the differences between compensation agreements and lump sum agreements (Appendix A hereto), while containing express mention of permanent partial impairment, contains no mention of permanent partial disability. Likewise, the lump sum agreement fails to provide for the nonmedical factors which are required in arriving at a disability rating (I recognize that there are cases wherein there may be no disability over and above impairment, but the Commission has not so found in this case, and the record establishes that under the facts of this case such a finding would likely not be made.) The Commission's order contains one mention of Harmon's educational background, but makes no attempt to apply that factor in analyzing any portion of the lump sum award. There is no discussion of any further nonmedical factors to be considered in the award. On the basis of the above, one can only conclude that, not only was no permanent partial disability rating done for Harmon, but nonmedical factors were not considered in the Commission's decision to uphold the lump sum agreement.

There is language in the Commission's order indicating that an additional deposition was presented to the Commission subsequent to the hearing. We do not have the benefit of this additional deposition in the record on appeal and therefore, do not know whether it contained any discussion of nonmedical factors. We only know that the Commission's order contained no mention of such factors. On this basis, I can only conclude that nonmedical factors were not considered in the Commission's opinion.

During oral argument, counsel for respondents contended that the $6,864 ex-

press award for retraining/vocational assistance in the lump sum agreement was an express award for a nonmedical factor, indicating that Harmon's permanent partial disability had both been considered and adjudicated by the Commission in upholding the lump sum agreement. I am not persuaded by this argument. Using the rule of *Curtis, supra,* wherein we presume that different statutory definitions, passed simultaneously by the legislature, indicate different definitions and classifications, I can only conclude that an award for retraining is a distinct factor separate from the nonmedical factors considered in a permanent disability rating. As already mentioned, the factors salient in a permanent disability rating are enumerated in I.C. § 72–425 and § 72–430. I.C. § 72–450 provides a *separate* statutory definition for retraining benefits. Accordingly, any award for retraining does not indicate that the nonmedical factors pertinent to a rating of permanent disability were ever considered or adjudicated. In *Lyons v. Industrial Special Indem. Fund,* 98 Idaho 403, 565 P.2d 1360 (1977), Justice Donaldson writing for this Court stated:

> In addition to the medical factor of permanent impairment, the Commission must also consider nonmedical factors such as age, sex, education, economic and social environment, training, and usable skills. I.C. § 72–425. The Commission's approach in this case does not adequately consider the effect of these nonmedical factors on appellants ability to obtain employment.

Here, the insurance adjustor did not advise the claimant of the nonmedical factors, the compensation agreement did not provide for them, and the commission did not consider or award them.

Therefore, I conclude that the Commission did not adjudicate the issue of Harmon's permanent partial disability rating, and, therefore, the lump sum agreement, binding on Harmon as to all other issues which were fully adjudicated, does not preclude further consideration by the Commission as to the amount of entitlement for nonmedical factors over and above impairment.

The Worker's Compensation statutes provide that in certain instances the commission may, on its own motion, reopen a case—one would hope that in this case it would do so.

Comp. Agreement | Lump Sum

-Comp Rate $133

PPi _____ 11,110⁰⁰ | PPi _____ $ 11,110

- 111.10 X 4 = 444⁴⁴ | Consideration:
Till exhausted. | Vocational Retrain __ $ 6,964
- less advances 550 | -52 v x $133*
Net $ 10,560⁰⁰ |
Med. — 5 YRS (manes) | Future Med. 500⁰⁰
| $ 18,474²⁰
Rehab OJI on (Institutional) | Less advances 550⁰⁰
Retraining Tvn 52 wks | Net 17,924⁰⁰
@ $ | Atty fee. —
52 wks). |

| * present Rate

**DEFENDANT'S EXHIBIT 24**

---

BISTLINE, Justice, dissenting.

I concur in Justice Huntley's dissent and write only to discuss two additional reasons why this Court should reverse the Industrial Commission's approval of the lump sum settlement between the parties. Those reasons are as follows:

(1) The Industrial Commission abused its discretion in approving the settlement which it initially rejected. The Commission initially and correctly found the settlement amount of $500 insufficient to cover Harmon's future medical payments, which later amounted to over $17,000. The Commission received no further information to justify reversing its finding.

(2) Don MacMillan, the claims examiner for Industrial Indemnity, procured the commission's approval of the set-

tlement through an act of constructive fraud. In order to persuade the Commission to reverse itself, he solicited a doctor's opinion of Harmon's condition based not on an actual examination, but on his own biased assurance, related over the phone, that Harmon was much improved.

## I.

The language of I.C. § 72–404 establishes a discretionary standard when the commission is asked to approve a lump sum settlement:

> **72–404. Lump sum payments.**—*Whenever the commission determines that it is for the best interest of all parties,* the liability of the employer for compensation *may,* on application to the commission by any party interested, be discharged in whole or in part by the payment of one or more lump sums to be determined, with the approval of the commission. (Emphasis added.)

A reviewing court may overturn commission approval upon a showing that its discretion has been abused. *Kaylor v. Callahan Zinc-Lead Co.,* 43 Idaho 477, 253 P. 132 (1927). This is such a case.

The commission initially denied approval of the agreement negotiated between Don MacMillan and Mr. Harmon on November 6, 1981. The commission's order of that date did not specify why it denied approval. However, the record reveals the reason. MacMillan's daily log of his activity on Harmon's claim relates that Commissioner Diefenbach considered the agreement not to be in the best interests of Harmon since there was insufficient justification for the low amount ($500) of future medical payments.

I have no quarrel with the fact that Harmon, by and large, got what he bargained for. He consistently expressed his desire for a lump sum so that he could set himself up in business. However, he also consistently testified that he was under the impression that the specific lump sum option left medical payments open for five years. My contention is that the commis-

sion abused its discretion in approving the small amount for future medical expenses, not in approving a lump sum agreement *per se.*

The only basis the commission had for reversing itself was a letter from Dr. Burton [see appendix] to MacMillan dated November 9, 1981. *Dr. Burton was the surety's suggested consultant,* a specific finding of fact in the commission order here appealed. MacMillan solicited this letter to bolster his position with the commission. However, the letter does not say that $500 is a reasonable amount for Harmon's future medical expense. It merely expresses the opinion that additional surgery was not indicated and that settlement might be appropriate. Those opinions were based *not* on any further examination of Harmon, but merely on MacMillan's opinion that Harmon looked improved. They conflicted with the opinions of Dr. Porter, Harmon's treating physician. MacMillan did not contact Dr. Porter to ask whether $500 was reasonable. If the agreement was insufficient medically as the commission initially found, I see nothing in this letter that justifies approval of the settlement. It adds nothing additional to that which was before the Commission when it rejected the agreement a scant ten days earlier. Therefore, I respectfully submit that its approval was an abuse of discretion.

Significantly, the reconsideration of the agreement was done in a totally *ex parte* context. Harmon was not represented by counsel. It is true that Harmon chose not to retain counsel. However, this was after MacMillan informed him that the Company would not change its position even if he did hire an attorney, and that attorney's fees would only reduce Harmon's recovery. This is a fact scenario fraught with overreaching and not uncommon in successful bad faith actions against insurers.

In direct testimony, MacMillan said he informed Harmon of the Commission's rejection of the agreement, but there is nothing to indicate that he told Harmon the reason for the rejection. Harmon himself testified as follows:

Q. Let me ask you the questions.

After—did Mr. MacMillan call you after you signed the compensation Agreement advising you there had been some problem concerning its approval?

A. Yes.

Q. And what was stated in that conversation by Mr. MacMillan to you?

A. That the Industrial Board wanted to talk to me about some problem with the agreement and that they were going to call me.

Q. All right. Did you receive a later phone call from Mr. MacMillan?

A. Yes, I did.

Q. What was told to you in that conversation?

A. *Straightened up everything that was wrong with it and not for me to worry about it anymore. It was all settled.*

Q. That was the content of those two telephone conversations?

A. Yes.

Q. And do you ever recall being advised that you could or should contact the Industrial Commission concerning the content of your settlement?

A. No.

Q. Did you ever get any phone call from the Industrial Commission concerning that settlement?

A. No, I did not. (Emphasis added.)

Thus, it appears approval was gained while Harmon was totally unaware that the commission was concerned specifically about the sufficiency of the future medical expenses.

## II.

I contend that Mr. MacMillan procured the commission's approval of the lump sum settlement through an act of constructive fraud. The Commission concluded that no fraud had been demonstrated. However, since this is a conclusion of law, not a finding of fact, we are not bound by the deferential substantial evidence standard of review.

1. MacMillan is a Ph.D. historian, not an M.D.

MacMillan's strategy early on was to obtain a lump sum agreement. His daily log contained a note dated 4–13–82: "aim for lump" by 12–15–81. A 6–9–81 note in his log stated in part:

Plan: . . .
(4) Look for opportunity to lump: cultivate.

| | |
|---|---|
| Exposure & | Two surgeries, heavy, no education, or training, questionable motivation, loose life-style, poor work history. |
| Assessment: | Friend a previous back case. Apparent low threshold of pain . . . |

Industrial Indemnity's rehabilitation nurse reported early in July 1981, as follows:

Jim Spooner visited with Tom just before I arrived and I talked with Jim about it after we had both completed our visits. Jim and I both feel that having had two back surgeries within six months and having the residual that he is having that *we are in definite trouble with this claim.* (Emphasis added.)

Thus, MacMillan was faced with a potentially very expensive claim. Settling cheap was obviously in the best interest of his employer Industrial Indemnity. The first denial of the settlement was a set back for him but only a temporary one. His log on 11–9–81 indicates that the commission wanted something from a doctor saying that the settlement was in the best interest of the claimant. The same day MacMillan reached Dr. Burton, Industrial Indemnity's consultant, on the phone. The result was the critical letter that induced the commission to reverse itself.

The letter parrotted MacMillan's assessment that Harmon had improved considerably. However, this view was not based on a medical examination, but only on MacMillan's subjective opinion that Harmon looked well when they discussed the lump sum agreement. Three days before his visit with Harmon, MacMillan received a report from Dr. Porter, Harmon's treating physician, that the patient had not improved over the past several months.

"Dr. MacMillan's diagnosis[1] that Harmon was much improved found its way into

Dr. Burton's letter of November 9, 1981. MacMillan received this document on November 16, 1981, hand-carried it to the commission, and the case was closed all on the same day, all without full disclosure to, much less a hearing for, Harmon.

While the efficiency of the procedure employed here is evident, one can only wonder if Harmon's interest was adequately safeguarded.

In my view, the commission abdicated its responsibility in this case by allowing itself to become the tool of MacMillan. It appears that the fears of Professor Larson, the leading authority on workmen's compensation, are on their way to being realized in Idaho:

> In some jurisdictions, the excessive and indiscriminate use of the *lump-summing* device has reached a point at which it *threatens to undermine the real purposes of the compensation system.* Since compensation is a segment of a total income insurance system, it ordinarily does its share of the job only if it can be depended on to supply periodic income benefits replacing a portion of lost earnings. If a partially or totally disabled worker gives up these reliable periodic payments in exchange for a large sum of cash immediately in hand, experience has shown that in many cases the lump sum is soon dissipated and the workman is right back where he would have been if workmen's compensation had never existed. On reason for the persistence of this problem is that practically everyone associated with the system has an incentive—at least a highly visible short-term incentive—to resort to lump-summing, the employer and the carrier are glad to get the case off their books once and for all. The claimant is dazzled by the vision of perhaps the largest sum of money he had ever seen in one piece. The claimant's lawyer finds it much more convenient to get his full fee promptly out of a lump sum than protractedly out of small weekly payments. The claimant's doctor, and his other creditors and his wife and family, all typically line up on the side of encouraging a lump-sum settlement. *Who then is to hold the line against turning the entire income-protection system into a mere mechanism for handing over cash damages as retribution for industrial injury? It should be the administrator,* but even he all too often is relieved to get the case completely removed from his docket. With all these pressures pushing in the direction of lump-summing, it is perhaps surprising that the practice has not become even more prevalent than it already has.

> *The only solution lies in conscientious administration, with unrelenting insistence that lump-summing be restricted to those exceptional cases in which it can be demonstrated that the purpose of the Act will best be served by a lump-sum award.* 3 Larson's Workmen's Compensation Law (1983), pp. 15–594 through 15–596 (emphasis added).

Constructive fraud sufficient to reopen a case may be based upon even innocent misrepresentations made by the insurer's physician, Larson, *supra,* vol. 3, pp. 15–554.-100, 15–554.102. Dr. Burton's adoption of MacMillan's bogus diagnosis that Harmon had improved considerably, together with MacMillan's successful counsel against Harmon's hiring of an attorney in the *ex parte* context in which this sorry tale was written, all make out, at a minimum, a case of over-reaching, probably bad faith, and, I am persuaded, constructive fraud, such that the Commission's approval of the lump sum settlement should be reversed.